## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**BLUE WATER BALTIMORE, INC.**          :
2631 Sisson Street                              :
Baltimore, MD 21211                          :          CIVIL ACTION - LAW
                                                              :
     Plaintiffs,                                :
v.                                                             :
                                                              :          No.:_____
**MAYOR & CITY COUNCIL OF**             :
**BALTIMORE**                                    :
City Hall, 100 N. Holliday Street             :
Baltimore, Maryland 21202                    :
                                                              :
     Defendants.                              :

## COMPLAINT

And now the Plaintiff, Blue Water Baltimore, Inc., by and through its attorneys,

Chesapeake Legal Alliance and Barley Snyder, files this Complaint alleging the following:

## STATEMENT OF THE CASE

1.      This is a citizen suit for declaratory and injunctive relief, the assessment of civil

penalties, and other appropriate relief against the Mayor and City Council of Baltimore

("Defendants" or "Baltimore City") for violations of the Federal Water Pollution Control Act, 33

U.S.C. § 1251 *et seq*. (hereafter the Clean Water Act ("CWA")).

2.      These violations occurred and are occurring at the Patapsco Wastewater

Treatment Plant ("Patapsco WWTP") and the Back River Wastewater Treatment Plant ("Back

River WWTP") (collectively, "Facilities"). The Patapsco Wastewater Treatment Plant is located

at 3501 Asiatic Ave, Baltimore, MD 21226. The Back River WWTP is located at 8201 Eastern Ave, Baltimore, MD 21224. Both Facilities are owned and operated by Defendants.

3.      As detailed below, Defendants have discharged and continue to discharge pollutants into waters of the United States in violation of sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342, and the conditions and limitations of National Pollutant Discharge Elimination System ("NPDES") Permit No. MD0021601 (State Permit 15-DP-0580) ("Patapsco Permit") and NPDES Permit No. MD0021555 (State Permit 15-DP-0581) ("Back River Permit"), issued pursuant to section 402 of the CWA, 33 U.S.C. § 1342.

4.      Defendants have demonstrated an unwillingness and/or inability to comply with the terms of their NPDES permits as well as federal and state law.

## JURISDICTION AND VENUE

5.      This Court has original subject matter jurisdiction over this action pursuant to 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over state law claims included in this Complaint pursuant to 28 U.S.C. § 1367.

7.      Pursuant to 33 U.S.C. § 1365(c), venue is correct because the Clean Water Act (CWA) violations alleged in this Complaint occurred or may occur in this District.

8.      Pursuant to the CWA, 33 U.S.C. § 1365(b)(1)(A) (requiring 60 days notice), Blue Water Baltimore. ("Plaintiff") gave notice on October 5, 2021, which is more than 60 days prior to commencing this action, to all required parties including: 1) the Defendants; 2) the Maryland Department of the Environment ("the Department"); 3) the United States Environmental Protection Agency (EPA); and 4) the State of Maryland.

8993442.1

9.      Neither EPA nor the State of Maryland has commenced or is diligently prosecuting a civil or criminal action against Defendants in a court of the United States or the State of Maryland, or pursuing an administrative penalty action, to require compliance with the laws, rules, regulations, permits, standards, or limitations at issue in this case.

10.     As explained below, Defendants are in violation of effluent standards and limitations set forth in their Permits and are not otherwise complying with the terms and conditions of the Permits. Therefore, the violations alleged herein will continue until this Court enjoins Defendants from discharging in violation of the Permits and orders Defendants to address and remedy the underlying causes of the violations.

## PARTIES

11.     Plaintiff Blue Water Baltimore is a 501(c)(3) nonprofit organization formed in 2010. It is dedicated to protecting clean water in the Baltimore, Maryland, area. Blue Water Baltimore is headquartered at 2631 Sisson Street, Baltimore, Maryland. Its mission is to protect and restore the Baltimore Harbor, the greater Patapsco and Back Rivers, and their tributaries through enforcement, fieldwork, and citizen action on behalf of its members in order to make these waterways suitable for recreation (including fishing and swimming), to improve public health, and to improve the health of the aquatic ecosystems. Baltimore Harbor Waterkeeper, a program of Blue Water Baltimore, is responsible for protecting the Patapsco River and Back River watersheds, including all of the neighborhood streams and rivers that discharge into the Patapsco and Back Rivers.

12.     Blue Water Baltimore has over 1000 members, over 800 of whom live in Baltimore City and Baltimore County, surrounded by the Patapsco and Back Rivers, which drain to the Chesapeake Bay.

8993442.1

Blue Water Baltimore supports its members by utilizing the CWA and other environmental laws to stop pollution that threatens public health, impairs water quality, damages ecosystems, and negatively impacts the ability of its members to use and enjoy the waterways of Baltimore. Blue Water Baltimore's members include individuals who participate in and enjoy many recreational activities in and around the Patapsco and Back Rivers and the Chesapeake Bay, including fishing, boating, kayaking, and enjoyment of their aesthetic qualities. *See* Declarations of Alice Volpitta, Desiree Greaver, Sara Bundy, and Rodette Jones. Attached as Exhibit 1 and incorporated herein.

13.     Blue Water Baltimore's members are harmed by the violations alleged in this Complaint. Pollution in Patapsco and Back Rivers impairs water quality, threatens public health, and harms river habitats and aquatic ecosystems. Defendants' violations of the CWA have resulted in excess pollution which impairs the water quality and contributes to algae blooms, fish kills, and unsafe swimming conditions in the Patapsco and Back Rivers and have diminished Blue Water Baltimore's members' use and enjoyment of these waters by making it less likely that they will continue to enjoy recreating on and around them in the future. *See* Declarations of Alice Volpitta, Desiree Greaver, Sara Bundy, and Rodette Jones. Exh. 1.

14.     A favorable decision in this matter would compel Baltimore City to comply with applicable laws and ensure the operation of the Facilities do not continue to negatively impact the water quality in the Back River, Patapsco River, and Chesapeake Bay and would lead to improvements in water quality and redress the concerns of Blue Water Baltimore's members.

15.     The interests that Plaintiff seeks to protect are germane to its organizational purposes.

16.     Neither the claims asserted nor the relief requested requires the participation of Plaintiff's individual members in this action.

17.     At all relevant times, Plaintiff was and is a "person" as that term is defined by the CWA, 33 U.S.C. § 1362(5).

18.     Defendants Baltimore Mayor and members of the Baltimore City Council are the executive and legislative components of the Baltimore City government and are the permittees and the responsible parties on the Permits. Their address is City Hall, 100 N. Holliday Street, Baltimore, MD 21202.

19.     Baltimore City owns and operates the Patapsco WWTP. The Facility treats wastewater from the Baltimore metropolitan area, including Baltimore City, Baltimore County, Anne Arundel County, and Howard County.

20.     Baltimore City also owns and operates the Back River WWTP. The Facility treats wastewater from Baltimore City and Baltimore County.

21.     The Defendants are "persons" within the meaning of the CWA, 33 U.S.C. § 1362(5).

## STATUTORY AND REGULATORY FRAMEWORK

22.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as an NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

23.     Title 9 of the Maryland Environment Code and its accompanying regulations detail Maryland's NPDES permit program.

8993442.1

24.     The term "discharge of pollutants" is defined in section 502(12) of the CWA, 33 U.S.C. § 1362(12), to mean "any addition of any pollutant to navigable waters from any point source…"

25.     The term "pollutant" is defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6) to mean "dredged spoil, solid waste. . . sewage. . . sewage sludge. . . chemical wastes, biological materials. . . . and industrial, municipal . . . waste discharged into water."

26.     The term "point source" is defined in section 502(14) of the CWA, 33 U.S.C. § 1362(14), to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel…from which pollutants are or may be discharged."

27.     The term "navigable waters" is defined in section 502(7) of the CWA, 33 U.S.C. § 1362(7) to mean "the waters of the United States, including the territorial seas."

28.     Section 402(a) of the Act, 33 U.S.C. § 1342(a), provides that the EPA may issue NPDES permits to "persons" that authorize the discharge of any pollutant into navigable waters, but only in compliance with section 301 of the Act, 33 U.S.C. § 1311, and such other conditions as EPA determines are necessary to carry out the provisions of the Act.

29.     Section 402(b) of the Act, 33 U.S.C. § 1342(b), provides that a State may establish its own permit program and, after receiving approval of its program by the EPA, may issue NPDES permits. Under COMAR 26.08.04.07, the State of Maryland established its own NPDES permit program and received EPA approval of its program in 1974. The Department issues NPDES permits under Title 9 of the Maryland Code of the Environment.

30.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), allows citizens to bring suit against "any person…alleged to be in violation" of an "effluent standard or limitation"

8993442.1

established under the CWA or "an order issued by…a State with respect to such a standard or limitation."

31.     Section 505(f)(7), 33 U.S.C. § 1365(f)(7) defines "effluent standard or limitation" as "a permit or condition of a permit issued under section 402 [33 U.S.C. § 1342]," the NPDES Permit is an "effluent standard or limitation" as defined by section 505(f)(7) of the CWA, 33 U.S.C. § 1366(f)(7).

32.     40 C.F.R. § 122.41 states that permittees "must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action…" 40 C.F.R. § 122.41(a).

33.     In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order Defendants to comply with the CWA and to assess civil penalties.

34.     Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

35.     Section 309(d) of the Act, 33 U.S.C. § 1319(d), provides that any person who violates, *inter alia*, section 301 of the Act, 33 U.S.C. § 1311, or who violates any condition or limitation of an NPDES permit issued pursuant to section 402 of the Act, 33 U.S.C. § 1342, shall be subject to a civil penalty.

36.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. §3701, any person who violates sections 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342, shall be subject to a civil penalty up to $56,460 per day per violation occurring on or after January 13,

2009. *See also* 40 C.F.R. § 19.4 for violations that occurred after November 2, 2015, where penalties are assessed after December 23, 2020.

## **FACTUAL BACKGROUND**

*The Facilities: Patapsco WWTP*

37.    The Patapsco WWTP Permit is effective October 1, 2017, to September 30, 2022, pursuant to § 402 of the CWA, 33 U.S.C. § 1342(b).

38.    The Patapsco Permit authorizes Defendants to discharge pollutants from treated wastewater to the Patapsco River in accordance with certain effluent limitations, monitoring requirements, and other conditions set forth in the Permit.

39.    The Patapsco Permit authorizes Defendants to discharge pollutants via Outfall 001A into the Patapsco River, which flows to the Chesapeake Bay.

40.    Outfall 001A is a point source under the Clean Water Act.

41.    The Patapsco River is a tidal estuary located on the western shore of the Chesapeake Bay that includes the Baltimore Harbor, Curtis Creek, and Bear Creek. The Patapsco WWTP discharges into the Patapsco River Mesohaline sub-watershed 7.5 miles from the River's confluence with the Chesapeake Bay.

42.    The Patapsco River is designated Use II waters for support of estuarine and marine aquatic life and shellfish harvesting.

43.    The Patapsco River is a navigable water of the United States within the meaning of 33 U.S.C. § 1362(7).

44.    The Department has listed the Patapsco River under section 303(d) of the CWA as impaired for the following pollutants: total phosphorus, total nitrogen, total suspended solids, Enterococcus, toxics (polychlorinated biphenyls, or PCBs), chlordane, impacts to biological

8

communities, and debris/Floatables.

45.     The EPA has approved the Department's Total Maximum Daily Loads ("TMDL") for the Patapsco River Mesohaline for nitrogen (2007), phosphorus (2007), and trash and debris (2016). In addition, TMDLs have been established for the Baltimore Harbor for chlordane (2001) and PCBs (2012). The Patapsco River is also part of the Chesapeake Bay TMDL, established in 2010, which limits total nitrogen, total phosphorus, and TSS entering the Chesapeake Bay. Maryland's Watershed Implementation Plan for the Bay TMDL recognizes the Patapsco WWTP as having a significant impact on the state's overall nutrient load to the Chesapeake Bay.

46.     Excessive nutrient pollution to the Patapsco River and the Chesapeake Bay can result in harmful algae blooms, fish kills, and other negative environmental and health impacts.

*The Facilities: Back River Wastewater Treatment Plant*

47.     The Back River WWTP Permit is effective May 1, 2018 to April 30, 2023, pursuant to § 402 of the CWA, 33 U.S.C. § 1342(b).

48.     The Back River Permit authorizes Defendants to discharge pollutants from treated wastewater to the Back River in accordance with certain effluent limitations, monitoring requirements, and other conditions set forth in the Permit.

49.     The Back River Permit authorizes Defendants to discharge pollutants via Outfall 001A into the Back River, which flows into the Chesapeake Bay and via Outfall 002A into High Head Lake at the Sparrows Point Trade Point Property, and from there, is pumped into existing outfalls to Bear Creek, which flows to the Chesapeake Bay.

50.     Outfall 001A and Outfall 002A are point sources under the Clean Water Act.

51.     The Back River is located on the western shore of the Chesapeake Bay. The Back River WWTP discharges into the Back River 6.3 miles from its confluence with the Chesapeake

Bay.

52.     The Back River is designated Use II waters for support of estuarine and marine aquatic life and shellfish harvesting.

53.     The Back River is a navigable water of the United States within the meaning of 33 U.S.C. § 1362(7).

54.     The Department has listed the Back River under section 303(d) of the CWA as impaired for the following pollutants: PCBs in sediment and fish tissue, sediments, chlordane, nitrogen and phosphorus, chlorides, and sulfates.

55.     The EPA has approved the Department's TMDLs for the Patapsco River Mesohaline for nutrients (established in 2005), chlordane (1999), zinc (2004), PCBs (2005), and E. coli (2007). The TMDLs for nutrients and PCBs for the Baltimore Harbor (established in 2007 and 2012, respectively) also apply to the Back River. In addition, the Back River is part of the Chesapeake Bay TMDL limits for total nitrogen, total phosphorus, and TSS. Maryland's Watershed Implementation Plan for the Bay TMDL recognizes the Back River WWTP as having a significant impact on the state's overall nutrient load to the Chesapeake Bay.

56.     Excessive nutrient pollution to the Back River and the Chesapeake Bay can result in harmful algae blooms, fish kills, and other negative environmental and health impacts.

*The Permits: Patapsco WWTP*

57.     The Patapsco Permit establishes, among others, the following effluent limits:

a.     BOD: 18,000 lb/d monthly average loading rate and 27,000 lb/d weekly average loading rate.

b.     TSS: 18,000 lb/d monthly average loading rate and 27,000 lb/d weekly average loading rate.

10

c.  Ammonia (As N): 3,836 lb/d monthly average loading rate from May 1 through October 31 each year.

d.  Total Phosphorus: 33,330 lb total May 1 through October 31, and 66,700 lb/yr.

e.  Total Nitrogen: 333,330 lb total May 1 through October 31, and 889,300 lb/yr.

f.  Enterococci: 35 MPN/100 ml monthly geometric mean.

g.  Total Residual Chlorine: 0.018 mg/l maximum.

h.  pH: minimum of 6.5 and maximum of 8.5.

i.  Dissolved oxygen: 5.0 mg/l minimum year-round, with minimum 6.0 mg/l weekly average February 1 through May 31.

58.  Defendants are required to submit timely and accurate Discharge Monitoring Reports ("DMRs") verifying compliance with the Patapsco Permit's effluent limits. (General Condition III.A.2.)

59.  The Patapsco Permit contains numerous Special and General Conditions that establish additional enforceable requirements on the Patapsco WWTP's operation.

60.  The Patapsco Permit Special Conditions pertain to, among other things: PCBs testing and reporting (Special Conditions II.B.1 and II.F.4), toxic chemical testing and reporting (Special Condition F), special reporting requirements including Wastewater Capacity Management Plans (Special Condition II.B.2), and mitigation of Fats, Oils, and Grease ("FOGs") (Special Condition M).

61.  The Patapsco Permit General Conditions pertain to, among other things: maintaining the Patapsco WWTP in efficient and good working order (General Condition III.B.3) and minimizing and preventing adverse impacts to waters of the state or to human health (General Condition III.B.4).

8993442.1

62.     The Patapsco Permit references civil and criminal penalties for violations of Permit Conditions (Civil and Criminal Penalties IV).

*The Permits: Back River WWTP*

63.     The Back River Permit establishes, among others, the following effluent limits for Outfall 001A:

a.      Biological Oxygen Demand (BOD): 11,000 lb/d monthly average loading rate and 16,000 lb/d weekly average loading rate.

b.      TSS: 11,000 lb/d monthly average loading rate and 16,000 lb/d weekly average loading rate, with an annual maximum of 3,959,228 lb.

c.      Ammonia (As N): 2,200 lb/d monthly average loading rate and 3,300 lb/d weekly average loading rate from May 1 through October 31 each year, and 5,529 lb/d monthly average loading rate the remainder of the year. Total nitrogen is limited to 99,782 lb/m from May 1 to October 31, with an annual maximum of 1,582,055 lb.

d.      Total Phosphorus: 220 lb/d monthly average loading rate and 330 lb/d weekly average loading rate, with a limit of 6,652 lb/m from May 1 through October 31, and total limit of 79,277 lb.

e.      E. coli: 126 MPN/100 ml monthly geometric mean.

f.      Total Residual Chlorine: 0.011 mg/l.

g.      pH: minimum of 6.5 and maximum of 8.5.

h.      Dissolved oxygen: 5.0 mg/l minimum year-round, with minimum 6.0 mg/l weekly average February 1 through May 31.

i.      WET Acute Toxicity: TUa<1.00.

j.      WET Chronic Toxicity: TUc<1.02.

64.     The Back River Permit establishes, among others, the following effluent limits for Outfall 002A:

a.     Biological Oxygen Demand (BOD): 8,340 lb/d monthly average loading rate and 12,520 lb/d weekly average loading rate from May 1 through October 31, and 12,520 lb/d monthly average loading rate and 18,770 lb/d weekly average loading rate for the remainder of the year.

b.     TSS: 12,520 lb/d monthly average loading rate and 18,770 lb/d weekly average loading rate, with an annual maximum of 4,589,026 lb.

c.     Ammonia (As N): 830 lb/d monthly average loading rate and 1,250 lb/d weekly average loading rate from May 1 through October 31 each year, and 2,120 lb/d monthly average loading rate the remainder of the year. Total nitrogen is limited to 230,294 from May 1 to October 31, with an annual maximum of 610,748 lb.

d.     Total Phosphorus: 83 lb/d monthly average loading rate and 125 lb/d weekly average loading rate, with a limit of 15,353 lb total from May 1 through October 31, and an overall limit of 30,363 lb/y.

e.     E. coli: 126 MPN/100 ml monthly geometric mean.

f.     pH: minimum of 6.5 and maximum of 8.5.

g.     Dissolved oxygen: 5.0 mg/l minimum year-round, with minimum 6.0 mg/l weekly average February 1 through May 31.

65.     The entire Back River WWTP (Outfalls 001A and 002A combined, are subject to annual load limits:

a.      Total Nitrogen: 2,192,800 lb/y.

b.     Total Phosphorus: 109,600 lb/y.

c.      TSS: 8,548,254 lb/y.

66.      Defendants are required to submit timely and accurate DMRs verifying compliance with the Back River Permit's effluent limits. (General Condition III.A.2).

67.      The Back River Permit contains numerous Special and General Conditions that establish additional enforceable requirements on the Back River WWTP's operation.

68.      The Back River Permit Special Conditions pertain to, among other things: PCBs testing and reporting (Special Conditions II.B) and the proper execution of a biomonitoring program (Special Condition D).

69.      The Back River Permit General Conditions pertain to, among other things: required notifications of any permit noncompliance (General Condition III.B.1), requirements to provide information to regulators upon request (General Condition III.B.11), maintaining the Back River WWTP in efficient and good working order (General Condition III.B.3), and minimizing and preventing adverse impacts to waters of the state or to human health (General Condition III.B.4).

70.      The Back River Permit references civil and criminal penalties for violations of Permit Conditions (General Conditions C.15 and C.16).

## CAUSES OF ACTION

### Counts 1-15

### Count 1: Failure to Comply with the Patapsco Permit's Effluent Limits

71.      Plaintiff realleges and incorporates by reference all preceding paragraphs.

72.      The Patapsco Permit requires compliance with state water pollution abatement statutes in particular Title 9, Subtitle 3 of the Maryland Environment Code. Permit II.C.13. Section 9-342 states that any person who violates a permit condition, including effluent limits, is

14

subject to civil and administrative enforcement action, including, but not limited to, injunctive relief and monetary penalties. In addition, each day a violation occurs is a separate violation of the permit and state law.

73.     For the Patapsco WWTP, DMR data from January 2017 - September 2021 show that Defendants violated the Patapsco Permit limits described above in Paragraph 57 at least 133 times, for a total of 899 exceedance days, for various pollutants including nitrogen, phosphorus, TSS, enterococci, and BOD.

74.     Defendants have violated and are violating sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, and Md. Code Ann., Envir. §9-322 which prohibit the "discharge" of pollutants except in compliance with conditions of an NPDES permit.

75.     Each day during the last five years that Defendants exceeded effluent limits and continues to exceed is a separate violation of the CWA. Defendants are subject to civil penalties under CWA section 309(d), 33 U.S.C. § 1319(d), for which a penalty of up to $37,500 per day for each violation occurring through November 2, 2015, and $56,460 per day for each violation thereafter. 40 C.F.R. § 19.4.

**Count 2: Failure to Comply with Patapsco Permit Special Condition II.B.1 and II.F.4 Requiring Adequate Testing and Reporting of PCBs**

76.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

77.     Special Condition II.B.1 of the Patapsco Permit requires Defendants to monitor PCBs year-round by reporting a 24-hour composite measure from a sample taken quarterly. Monitoring for PCBs and all other toxic chemicals monitoring required by the Patapsco Permit is required to be performed in accordance with protocols specified by the Department that include specifications of "analytical methodology, detection levels, holding times, preservation methods, sample types and reporting.

8993442.1

78.     Based on information and belief, Defendants have not complied with the requirements of Special Condition II.B.1 described above. For example, Department inspections reveal that rinsate and equipment blanks have been collected incorrectly for the purposes of the PCB TMDL that applies to the Patapsco WWTP. Furthermore, Defendants were inaccurately reporting the results of the testing. Both total PCBs and individually measured congeners must be reported under Special Condition F(4) of the Patapsco Permit. In addition, Defendants neglected to report a second quarterly sample taken on January 12, 2021 and failed to report twelve PCB congeners that are specified in the Department's "Reporting Requirements for PCBs (PCB Congeners by EPA method 1668 A or C Rev 11/9/2017)" guidance document.

79.     Defendants have continually failed to satisfy the requirements of Special Condition II.B.1, which is enforceable pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

**<u>Count 3: Failure to Comply with Patapsco Permit Special Condition II.F Requiring Toxic Chemical Testing</u>**

80.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

81.     Special Condition II.F of the Patapsco Permit requires toxic chemical testing concurrently with the biomonitoring program required elsewhere in the permit. Defendants must test effluent from the Patapsco WWTP for all chemicals identified in the Department's Toxic Pollutant Monitoring Protocol and Reporting Requirements for Toxic Chemical Testing Analytical Data and must perform the tests in accordance with 40 CFR Part 136 and the Department-approved toxic chemical testing plan.

82.     Based on information and belief, Defendants' inadequate testing and reporting of toxic chemicals has been an ongoing problem at the Facility. The Department's May 2021 inspection of the Patapsco Facility found that Defendants failed to meet the sampling and

analytical requirements for the 2021 Toxic Chemical testing and failed to properly collect rinsate and equipment blanks for toxic chemical testing.

83.     In addition, a routine inspection of the Patapsco WWTP by the Department on September 26, 2018, found that Defendants 1) did not quantify acrolein and cyanide to the level specified in the Permit, 2) used incorrect sampling methods for phenols, and 3) that the Department had "additional concerns regarding toxic chemical testing that will be resolved as a later date after further investigations and discussions with the permittee."

84.     Defendants have continually failed to meet Special Condition II.F, which is enforceable pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

**Count 4: Failure to Comply with Patapsco Permit Special Condition II.B.2 Requiring Wastewater Capacity Management Plans**

85.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

86.     Wastewater Capacity Management Plans ("WCMP") are required where a plant has a three-year average flow at or above 80% of its design capacity. Special Condition II.B.2 requires the Patapsco WWTP to submit a Wastewater Capacity Management Plan ("WCMP") within 90 days of the effective date of the permit.

87.     A three-year update of the WCMP for the period ending December 2020 is required.

88.     The most recent WCMP for Patapsco was the 2017 Wastewater Capacity Management Plan, submitted February 9, 2019. Defendants have not submitted an updated WCMP for the period of 2017-2020.

89.     Based on information and belief, Defendants have not complied with Special Permit Condition II.B.2 by failing to submit a three-year updated WCMP for the period ending

December 2020 to the Department. This constitutes a continuous enforceable violation of the CWA, 33 U.S.C. § 1365(a)(1)(A).

### Count 5: Failure to Comply with Patapsco Permit Special Condition II.M Requiring Mitigation of FOGs

90.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

91.     Special Condition II.M requires the Patapsco WWTP to develop and implement a FOG mitigation plan that includes "a description of the measures that will be taken to achieve the maximum practicable reduction of fats oils and grease and implementation schedule." The plan is required to include "[r]egular maintenance and repair of the skimmers, as required in the Department's Consent Order (CO-16-2405)."

92.     The Patapsco Permit requires Defendants to submit annual updates to the Department on all measures taken to comply with the FOG mitigation plan.

93.     Defendants have not conducted required maintenance and repair of the systems that control FOGs. The Department's May 6, 2021 inspection of the Facility found that the current mitigation plan is not accurate or consistent with current Facility operations. The inspection noted that 1) only five of 18 primary settling tanks were operational; 2) planned replacement or refurbishment of the actuators, flight plant brackets, and scum troughs had not yet begun, and 3) most of the problems identified in the mitigation plan had not been corrected.

94.     Defendants did not submit the annual update for 2018, 2019, and 2020 on measures taken at the Patapsco WWTP to comply with the FOG mitigation plan.

95.     Based on information and belief, Defendants have not complied with Special Permit Condition II.M by failing to maintain FOG control systems and by failing to submit annual updates to the Department. This constitutes a continuous enforceable violation of the CWA, 33 U.S.C. § 1365(a)(1)(A).

18

**Count 6: Failure to Comply with Patapsco Permit General Condition III.A Requiring Monitoring and Reporting**

96.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

97.     General Condition A of the Patapsco Permit contains numerous provisions about the testing and reporting of samples from the Patapsco WWTP, including the requirements that Defendants take representative samples, submit chain-of-custody forms with toxic chemical samples, and use sampling and analytical methods that conform to the procedures described in 40 C.F.R. Part 136. Defendants have consistently handled samples from the Patapsco WWTP in a manner that does not comply with these requirements. The Defendants have repeatedly processed samples outside of the specified holding time, lost samples, and did not take required samples, including but not limited to:

●       December 8, 22, and 23, 2017: BOD5 samples were analyzed outside of the specified holding time, resulting in no reportable results.

●       December 25, 2017: samples collected for orthophosphate were analyzed beyond the specified holding time, resulting in no reportable results.

●       September 26, 2018: a routine Department inspection found deficiencies in sample handling and in the reporting of toxic chemical testing to the Department.

●       September 22, 2020: shipping errors caused cyanide samples to arrive late at the testing laboratory, resulting in holding times and temperature criteria being exceeded.

●       September 24, 2020: no samples were taken because of a possible covid exposure.

●       November 22, 2020: deficiencies occurred in the BOD sample chain of command and the sample was processed outside of the specified holding time.

●       December 11, 2020: the TSS sample was analyzed beyond the specified holding time.

●       December 12, 2020: the TSS sample was analyzed beyond the specified holding time.

●       December 21, 2020: the orthophosphorus sample was lost and a new sample was required to be collected on December 24.

●    January 25, 2021: the Facility's phosphorous sample, required three times per month, was missed.

●    January 25, 2021: the Facility's TSS sample was run outside of the specified holding time.

●    January 25, 2021: staff failed to filter the orthophosphorus sample within 15 minutes of collection as is required under 40 C.F.R. Part 136.

●    March 12, 2021: the testing laboratory discarded samples for BOD and TSS.

98.    As set forth in Paragraph 97, above, Defendants have continually failed to meet General Condition III.A, which is enforceable pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

### Count 7: Failure to Comply with Patapsco Permit General Condition III.B.3 Regarding Facility Operations

99.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

100.    General Condition III.B.3 of the Patapsco Permit states that "all waste collection, control, treatment and disposal facilities shall be . . . operated efficiently to minimize upsets and discharges of excessive pollutants."

101.    Furthermore, General Condition III.B.3 states that "[t]he permittee shall provide an adequate operating staff qualified to carry out operation, maintenance and testing functions required to ensure compliance with this permit. Superintendents and operators must be certified by the Board of Waterworks and Waste Systems Operators" in accordance with Maryland law.

102.    As set forth elsewhere in this Complaint, Defendants have not maintained the Patapsco WWTP in good working order and are not operating the Facility efficiently, as demonstrated by the repeated effluent limit exceedances and violations and their failure to comply with a number of permit conditions. There have been multiple instances where Defendants failed to operate the Patapsco WWTP's treatment, control, and monitoring systems efficiently and in good working order. In addition, there have been repeated instances of

20

excessive discharges of pollution, failure to maintain FOG removal systems, and errors in sampling procedures.

103.    These chronic failures, effluent limits exceedances, and failure to comply with other permit conditions detailed above indicate systemic operation and maintenance failure by Defendants at the Patapsco WWTP.

104.    The last five years of inspections at the Patapsco WWTP, and other data and documentation, indicates that the Patapsco WWTP is continually failing to operate efficiently to minimize upsets and discharges of excessive pollutants in violation of Permit General Condition B.3. This constitutes an enforceable violation of the CWA, 33 U.S.C. § 1365(a)(1)(A).

### Count 8: Failure to Comply with Patapsco Permit General Condition III.B.4 Requiring Minimization of Impacts

105.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

106.    General Condition III.B.4. states that the "permittee shall take all reasonable steps to minimize any adverse impact to waters of this State, human health or the environment resulting from noncompliance with any effluent limitations specified in this permit, and must perform accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge."

107.    Defendants have violated General Condition III.B.4. of the Patapsco Permit by failing to take all reasonable steps to minimize or prevent adverse impact to waters of the State or to human health from the Patapsco WWTP. Repeated and continuous effluent limit exceedances have been documented by Defendants' own DMRs. Excessive FOG discharges have been previously cited by the Department through CO-16-2405 but the Patapsco WWTP has yet to remedy the issues and maintain their systems in good working order.

108.    Defendants have continually failed to meet General Condition III.B.4,. which is enforceable pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

### Count 9: Failure to Comply with the Back River Permit's Effluent Limits

109.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

110.    The Back River Permit requires compliance with state water pollution abatement statutes in particular Title 9, Subtitle 3 of the Maryland Environment Code. Permit II.C.13. Section 9-342 states that any person who violates a permit condition, including effluent limits, is subject to civil and administrative enforcement action, including but not limited to injunctive relief and monetary penalties. In addition, each day a violation occurs is a separate violation of the permit and state law.

111.    For the Back River WWTP, DMR data from January 2017 - September 2021 show the Back River Permit limits, described above in Paragraphs 63-65 above were violated at least 138 times, for a total of 1,611 exceedance days, for various pollutants including nitrogen, phosphorus, TSS, E. coli, and BOD.

112.    Defendants have violated and are violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, and Md. Code Ann., Envir. §9-322 which prohibit the "discharge" of pollutants    except in compliance with conditions of an NPDES permit.

113.    Each day during the last five years that Defendants exceeded effluent limits and continues to exceed is a separate violation of the CWA. Defendants are subject to civil penalties under CWA section 309(d), 33 U.S.C. § 1319(d), for which a penalty of up to $37,500 per day for each violation occurring through November 2, 2015, and $56,460 per day for each violation thereafter. 40 C.F.R. § 19.4.

**Count 10: Failure to Comply with Back River Permit Special Condition II.B and II.F.
Requiring Adequate Testing and Reporting of PCBs**

114.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

115.     Back River Permit Special Condition II.B requires Defendants to monitor PCBs year-round by reporting a 24-hour composite measure from a sample taken quarterly. Monitoring for all toxic chemicals, including PCBs, mandated by the Back River Permit that must be performed in accordance with protocols specified by the Department that include specifications of "analytical methodology, detection levels, holding times, preservation methods, sample types and reporting."

116.     Back River Permit Special Condition II.F. 4 requires Defendants to perform toxic chemical testing to be performed in accordance with 40 C.F.R. Part 136, and requires Defendants to report both total PCBs and individual PCB congeners.

117.     Based on information and belief, Defendants have not complied with the requirements of Special Conditions II.B and II.F described in Paragraphs 115 and 116. For example, the Department's June 2021 inspection of the Back River WWTP found that rinsate blanks were regularly contaminated during testing in 2019 and 2020, calling into question the validity of the testing performed.

118.     Furthermore, the PCB results from the Back River WWTP are not sufficient to meet permit requirements.  Laboratory reports did not contain concentration information for 12 PCB congeners that Defendants are required to report by the Back River Permit. In addition, the laboratory reports did not include results from the method blanks that are needed to determine if the Defendants satisfied required testing criteria.

119.    Defendants have continually failed to satisfy the requirements of Special
Conditions II.B and II.F, which are enforceable pursuant to the CWA, 33 U.S.C. §
1365(a)(1)(A).

### Count 11: Failure to Comply with Back River Permit Special Condition II.D Requiring a Biomonitoring Program

120.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

121.    Special Condition II.D of the Back River Permit requires Defendants to conduct
quarterly testing for chronic toxicity at the Back River WWTP. When two consecutive toxicity
tests show acute or chronic toxicity, Defendants must perform a repeat test within 60 days to
confirm the findings.

122.    Whole Effluent Toxicity ("WET") on February 25, 2021 and May 25, 2021
indicated that effluent from the Back River WWTP was chronically toxic to *Americamysis bahia*.
Defendants did not perform the required confirmation test.

123.    In addition, at the time of the Department's June 2021 inspection of the Back
River WWTP, results from the annual toxic chemical testing—conducted in February 2021 and
due to the Department in April 20201—had not yet been received by the Department.

124.    Based on information and belief, Defendants have not complied with the
requirements of Special Permit Condition II.D by their failure to conduct required confirmation
testing and failing to report results of annual toxics testing to the Department. This constitutes a
continuous enforceable violation of the CWA, 33 U.S.C. § 1365(a)(1)(A).

### Count 12: Failure to Comply with Back River Permit General Condition III.B.1 Requiring a Notifications of Permit Noncompliance

125.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

8993442.1

126.     General Condition III.B.1 of the Back River Permit requires Defendants to notify

the Department by telephone within 24 hours of any noncompliance with any permit condition.

Defendants must then provide information about the noncompliance, including a description of

the discharge, the cause of the discharge, the duration of the discharge, and steps being taken to

reduce and eliminate the noncomplying discharge, in writing within 5 days.

127.     During the Department's inspection of the Back River WWTP conducted this

summer, the Department identified many effluent violations between August 2020 and May

2021 for which no notification was provided, in violation of General Condition III.B.1. of the

Back River Permit.

128.     Defendants have continually failed to meet General Condition III.B.1, enforceable

pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

### Count 13: Failure to Comply with Back River Permit General Condition III.B.11 Regarding Reports and Information

129.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

130.     General Condition III.B.11 of the Back River Permit requires Defendants to

provide the Department, upon request, with copies upon request of records that are required to be

kept by the Back River Permit.

131.     The EPA conducts a DMR-Quality Assurance (DMR-QA) program to evaluate

the analytical ability of the laboratories that perform self-monitoring analyses required by

NPDES permits. Permittees required to participate in a DMR-QA study must report results for

permitted analytes that are on the study analyte list. DMR-QA Study 41 ("Study 41") was

initiated in April 2021, and requires permittees to submit results from chemistry, microbiology,

and WET tests.

132.     As a major permittee, the Back River WWTP is required to participate in the

annual DMR-QA.

133.     At the time of the inspection in June 2021, Defendants had failed to provide a

response to the Maryland State DMR/QA Coordinator regarding the Facility's required

participation in Study 41.

134.     Defendants' failure to respond violates their responsibilities specified in General

Condition B.11, which is enforceable pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

**Count 14: Failure to Comply with Back River Permit General Condition III.B.3 Regarding Facility Operations**

135.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

136.     General Condition III.B.3 of the Back River Permit states that "all waste

collection, control, treatment and disposal facilities shall be . . . operated efficiently to minimize

upsets and discharges of excessive pollutants."

137.     Furthermore, General Condition III.B.3 states that "[t]he permittee shall provide

an adequate operating staff qualified to carry out operation, maintenance and testing functions

required to ensure compliance with this permit. Superintendents and operators must be certified

by the Board of Waterworks and Waste Systems Operators" in accordance with Maryland law.

138.     Defendants have not maintained the Back River WWTP properly, and they are

not identifying and addressing failures in a timely manner. For example, Defendants reported

that the main centrifuge at the Back River WWTP had been malfunctioning since January 2021,

but evidence of effluent violations led the Department to conclude that the centrifuge had not

been functioning satisfactorily since mid-2020, resulting in improper processing of solids. In

addition, Defendants did not contract for temporary centrifuges to be provided until March 2021.

8993442.1

139.    Defendants' operational and maintenance failures at the Back River WWTP have led to effluent violations and other violations of the Back River Permit. The malfunctioning centrifuge has caused excessive TSS, BOD, and phosphorus discharges. The Department noted that many of these problems may have been preventable through routine maintenance.

140.    In addition to the main centrifuge, the Department found broken and malfunctioning equipment throughout the plant that is further contributing to its poor performance and may also have been preventable through regular maintenance.

141.    The Department further observed that, due to the treatment, operational changes, equipment failures, and effluent violations at the Facility, the Back River WWTP requires an updated Operations and Maintenance Manual.

142.    The Department's June 2021 inspection of the Back River WWTP also revealed that of the Facility's 76 certified operators, only 2 hold permanent licenses; the remainder have temporary licenses.

143.    Defendants have not maintained the Back River WWTP in good working order and are not operating the Facility efficiently, as demonstrated by the repeated effluent limit exceedances and violations, and their failure to comply with a number of permit conditions.

144.    These chronic maintenance and operation failures, effluent limits exceedances, and failures to comply with other permit conditions detailed above indicate systemic operation and maintenance failure by Defendants at the Back River WWTP. This constitutes a violation of General Condition III.B.3, which is an enforceable violation of the CWA, 33 U.S.C. § 1365(a)(1)(A).

**Count 15: Failure to Comply with Back River Permit General Condition III.B.4 Requiring Minimization of Impacts**

145.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

146.    Back River Permit General Condition III.B.4. states that the "permittee shall take all reasonable steps to minimize any adverse impact to waters of this State, human health or the environment resulting from noncompliance with any effluent limitations specified in this permit, and must perform accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge."

147.    Defendants have continually violated General Condition III.B.4. by failing to take all reasonable steps to minimize or prevent adverse impact to waters of the State or to human health from the Back River WWTP. Repeated and continuous effluent limit exceedances have been documented by Defendants' own DMRs. Defendants have failed to maintain equipment in good working order, contributing to these exceedances. In addition, Defendants did not comply with the requirement to conduct a third toxic test following two consecutive tests showing acute or chronic toxicity, and they have repeatedly failed to report complete results from PCB testing. Defendants' continuous failure to comply with General Condition III.B.4 is enforceable pursuant to the CWA, 33 U.S.C. § 1365(a)(1)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Declare that Defendants are in violation of the CWA and implementing regulations, applicable Maryland state law and regulations, and the Permits;

B.    Enjoin Defendants from further violation of the CWA and implementing regulations, applicable Maryland state statutes and regulations, and the Permits;

C.    Order Defendants to:

    i.    Immediately comply with all legal requirements, including permit terms and conditions;

28

    ii.        Assess and remediate the harmed caused by its violations;

D.      Assess civil penalties against Defendants and/or require the implementation of environmental projects to benefit the residents in areas impacted by the pollution violations;

E.      Award Plaintiff the cost of litigation including reasonable attorney's fees, costs, and expert fees and expenses;

F.      Retain jurisdiction until Defendants have fulfilled all legal and Court-ordered obligations; and

G.      Grant such further relief as the Court deems just and proper.


Date:   December 15, 2021       Respectfully submitted,

          _/s/ Patrick DeArmey_____
          Patrick DeArmey (District of Maryland Bar No. 21906)
          Chesapeake Legal Alliance
          501 Sixth Street
          Annapolis, MD  21403
          Telephone: (410) 216-9441
          Fax: (410) 216-7077
          Email: patrick@chesapeakelegal.org


          _/s/ Martin R, Siegel_____
          Martin R. Siegel (District of Maryland Bar No. 22028)
          Barley Snyder
          100 East Market Street
          York, PA 17401
          Telephone: (717) 718-7581
          Fax: (717)843-8492
          Email: msiegel@barley.com

          *Attorneys for Plaintiff Blue Water Baltimore*

8993442.1