**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **BLUE WATER BALTIMORE, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:21-cv-03176-LKG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF** | ) | |
| **BALTIMORE** | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFF'S SUPPLEMENTAL BRIEF ON IRREPARABLE HARM
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## Table of Contents

I.    INTRODUCTION .............................................................................................................. 1

II.   ARGUMENT .................................................................................................................... 2

    **A.**    Courts Have Widely Accepted That the Types of Harms Being Suffered by BWB and its Members Are Irreparable. ...................................................................................... 2

    **B.**    The Back and Patapsco Rivers and Chesapeake Bay Are Substantially Impaired by the Same Pollutants as Those Illegally Discharged by the WWTPs. ................................. 5

    **C.**    The Pollution from the Back River and Patapsco WWTPs is Directly Causing Irreparable Harm to BWB Members and the Public at Large. ..................................... 9

        **1.**    Illegal Pollution at Patapsco WWTP is Causing Irreparable Harm to BWB and its Members. ................................................................................................................. 9

        **2.**    Illegal Pollution at Back River WWTP is Causing Irreparable Harm to BWB and its Members. ............................................................................................................. 10

        **3.**    Illegal Discharges from Both WWTPs are causing Irreparable Harm to the Aquatic Ecosystems. ............................................................................................................. 13

    **D.**    Granting the Relief Requested in this Preliminary Injunction is Necessary to Prevent Further Irreparable Harm to the Patapsco and Back Rivers. .................................... 15

        **1.**    Preliminary Injunctive Relief is Appropriate and Necessary at Patapsco WWTP..... 16

            a.   Requested Relief would Reduce the Irreparable Harm Caused by the City's Effluent Violations at the Patapsco WWTP.................................................................. 18

            b.   Requested Relief Would Address Biosolids at Patapsco WWTP. ........................... 19

            c.   Preliminary Injunction Would Improve Patapsco WWTP's Fats, Oils, and Grease Issue. ..................................................................................................................... 20

            d.   Preliminary Injunction Would Protect Public Health by Requiring Warning Signs in Areas Affected by Permits Violations of the Patapsco Permit. ......................... 20

        **2.**    Preliminary Injunctive Relief is Appropriate and Necessary at Back River WWTP. 25

            a.   Requested Relief Would Set Deadlines and Ensure Needed Accountability at Back River WWTP. ....................................................................................................... 25

            b.   Preliminary Injunctive Relief would set Deadlines and Accountability for Lasting Compliance that has not been Achieved through MES Presence at the Back River WWTP. ................................................................................................................. 27

            c.   Preliminary Injunctive Relief Would Require Upkeep and Maintenance of Clarifiers at Back River WWTP. ...................................................................................... 28

            d.   Preliminary Injunctive Relief Would Require the City to Obtain Sufficient Staffing at Back River WWTP. ............................................................................................ 29

            e.   Bypasses at the Back River WWTP Trigger Notification Requirement in the Relief Requested. ............................................................................................................. 30

**E.**   Defendant's Delay and Lack of Responsiveness Leaves Plaintiff Without Other Options to Swiftly Redress Ongoing Irreparable Harm. ....................................................................... 32

III.   CONCLUSION ................................................................................................................ 33

<u>**Table of Authorities**</u>

**Cases**

*Am. Canoe Ass'n v. City of Wilson Wastewater Treatment Plant*, Consolidated Cases 5:96-CV-838-BR(2), 5:97-CV-471-BR(2), 5:97-CV-665-BR(2), 1998 U.S. Dist. LEXIS 7766 (E.D.N.C. Mar. 31, 1998) ................................................................................................................... 3

*Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987) ...................... 2

*Fola Coal Co., LLC*, 2016 U.S. Dist. LEXIS 73904 at 35-36 ............................................... 16, 33

*Md. Dep't of the Env't v. Cty. Comm'rs*, 465 Md. 169, 182-183 (2019) ........................................ 5

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 824 (9th Cir. 2018) . 4, 15, 16

*Norfolk S. Ry. v. City of Roanoke*, 916 F.3d 315, 325 (4th Cir. 2019) .......................................... 5

*Odessa Union Warehouse Co-op*, 833 F.2d. at 175 .................................................................... 33

*Ohio Valley Environmental Coalition v. Maple Coal Co.*, 808 F.Supp. 2d 868, 899 (S.D. W.V. 2011) ............................................................................................................................................ 3

*Ohio Valley Environmental Coalition, Inc. v Hobet Mining, LLC*, 723 F. Supp. 2d 886 (S.D. W.V. 2010) ................................................................................................................................... 3

*Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, No. 2:13-21588, 2016 U.S. Dist. LEXIS 73904, at *37 (S.D. W. Va. June 7, 2016) ............................................................................ 4

*Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC*, 744 F. Supp. 2d 561, 568 (S.D. W. Va. 2010) (*citing Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 157 (4th Cir. 2000)) ....................................................................................................................... 5

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) ............... 33

*Rivera v. United States*, 910 F. Supp. 239, 243 (D.V.I. 1996) .................................................... 12

*Sierra Club v. United States Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) ......... 9, 30

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987) .............. 17

*W. Va. Highlands Conservancy v. Lexington Coal Co., LLC*, No. 3:19-0573, 2021 U.S. Dist. LEXIS 237758, at *3 (S.D. W. Va. Dec. 13, 2021) ................................................................... 4

**Statutes**

33 U.S.C. § 1251; 92 P.L. 500, 86 Stat. 816 ............................................................................... 12

33 U.S.C. § 1313 ............................................................................................................................ 6

402 of the CWA, 33 U.S.C. § 1342 ............................................................................................... 1

Code of Maryland Regulations (COMAR) Section 26.08.10.08A(d) ........................................... 23

Code of Md., Env't Article § 9-331.1(b). Section 9-331.1 was amended by Chapter 310 of 2019 .............................................................................................................................................. 21, 22

COMAR 26.08.02.03-3 .................................................................................................................. 23

COMAR 26.08.10.08 (B) ............................................................................................................... 25

COMAR 26.08.10.08 (C) ............................................................................................................... 24

Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* .................................................... 1

Md. Code Ann., Envir. § 9-1601 ............................................................................................. 17, 18

Md. Code Ann., Envir. § 9-314 ...................................................................................................... 6

## I.      INTRODUCTION

Pursuant to Orders of this Court dated July 21, 2022 and July 27, 2022, Plaintiff Blue Water Baltimore ("BWB") files this supplemental brief to further describe the irreparable harm that it will suffer in the absence of an Order granting its requested relief. Specifically, BWB seeks to abate or minimize the harms caused by Defendant Mayor and City Council of Baltimore's ("City") related to ongoing violations and deficient operations at the Back River and Patapsco wastewater treatment plants (collectively "WWTPs").[1]

The matter before this Court is an extraordinary situation. For well over a year, the City has been operating the WWTPs in significant violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (hereafter the Clean Water Act ("CWA")) and the conditions and limitations of Permit No. MD0021601 (State Permit 15-DP-0580) ("Patapsco Permit") and NPDES Permit No. MD0021555 (State Permit 15-DP-0581) ("Back River Permit"), issued pursuant to section 402 of the CWA, 33 U.S.C. § 1342. When private industrial facilities violate their Clean Water Act permits in defiance of state and federal laws for months on end, the Maryland Department of the Environment ("MDE") has issued "stop work" orders to cease operations until a facility is capable of operating within its permitted limits. However, in the present case, the permittee is a public entity providing the vital public service of sewage treatment, and thus the state can no sooner issue a stop work order for the WWTPs than it can tell the public to stop using and flushing toilets.

Wastewater treatment plants exist to safeguard public health from a host of illnesses that are carried through pathogens in human waste and to ensure the environment is not degraded.

---

[1] *See* Pl. Compliant ECF No. 1. *See also* Md. Dep't of Env't. Inspection Report July 08, 2022 ("Patapsco 7/8/22 Inspection Report") at 5, ECF No. 36 at 8; MD Dep't of Env't Inspection Report for the Back River WWTP July 28, 2022 ("Back River Inspection Report") Ex. D.

The violations at the WWTPs and their impact on human health and the environment are well-documented. Alarmingly, the City continues to exhibit a lack of urgency in addressing pollution violations and the irreparable harm the WWTPs are causing the environment and the public. Rather than stepping up to expeditiously resolve the issues, the City instead makes excuses for why the violations are occurring, and continues to delay and ignore requests, deadlines, and corrective actions set forth in the MDE inspection reports.

The pollution violations and the unresolved deficiencies in operations of the facilities noted by MDE, the Maryland Environmental Service ("MES"), and independent engineers continue to cause irreparable harm to BWB, its members, the public, and the environment. Specifically, the current operations of the WWTPs pose significant risks to public health and the environment and severely limit the ability of BWB's members to recreate or participate in BWB events in the waters in the vicinity of the WWTP. A preliminary injunction is necessary to address the irreparable harm.

BWB's previous filings have set forth the legal prerequisites for the issuance of a preliminary injunction and will not be repeated here.

## II.    ARGUMENT

### A.    Courts Have Widely Accepted That the Types of Harms Being Suffered by BWB and its Members Are Irreparable.

The United States Supreme Court has long recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.* irreparable." *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987). Because of this, "[i]f such injury is sufficiently likely … the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* Excessive pollution from wastewater treatment plant discharges are just the "type of actual environmental

harm that the courts have found to be irreparable." *Am. Canoe Ass'n v. City of Wilson Wastewater Treatment Plant*, Consolidated Cases 5:96-CV-838-BR(2), 5:97-CV-471-BR(2), 5:97-CV-665-BR(2), 1998 U.S. Dist. LEXIS 7766 (E.D.N.C. Mar. 31, 1998).

In *Am. Canoe Ass'n*, the plaintiffs alleged hundreds of WWTP violations. *Id.* at 6. These violations included exceedances of permit limits for pollutants like Ammonia (as Nitrogen), Biochemical Oxygen Demand, Cyanide, Fecal Coliform Bacteria, Mercury, Lead, Toxic Suspended Solids, and Toxicity. *Id.* The court found that, "the history of violations and their effects on the receiving waterways shows that future harm is sufficiently likely and would be irreparable under *Amoco*." *Id.* at 26.

Although the Back River and Patapsco WWTPs have had numerous permit violations, the number of permit violations or pollutants being discharged does not need to be great for a court to issue an injunction. In fact, in a series of cases involving CWA permit limit violations by coal mine operations, the effects of a single pollutant largely formed the basis for a court to issue an injunction. In *Ohio Valley Environmental Coalition v. Maple Coal Co.*, 808 F.Supp. 2d 868, 899 (S.D. W.V. 2011), the court determined that the plaintiffs made the requisite showing that they are entitled to injunctive relief where the defendant mining company caused frequent violations of the selenium limits in its discharge permit. Similarly, in *Ohio Valley Environmental Coalition, Inc. v Hobet Mining, LLC*, 723 F. Supp. 2d 886 (S.D. W.V. 2010), the court noted "the toxic nature of selenium" to aquatic species in finding there was irreparable harm.

The condition of the waterways impacted by the permit violations and the purpose behind the statute in question were both critical in the courts' analyses in these cases. For example, the court in *Hobet* noted that the water quality of the Mud River watershed, like the Chesapeake Bay watershed, was designated by regulators as impaired under the Clean Water Act by the same

pollutants being illegally discharged. In addition, a Total Maximum Daily Load ("TMDL") had

been established to cap the amount of pollution that could be discharged into that watershed. *Id.*

at 907. West Virginia regulators specifically devised Hobet Mining's permit to be in "conformity

with the TMDL." *Id.* at 897. Thus, the operation was not just violating the legal limit, but in

doing so, was necessarily "contributing to the degradation of the Mud River watershed in the

form of excess selenium pollution" that was, therefore, "sufficient to establish irreparable harm."

*Id.* at 924. Such degradation of water quality standards, the court found, runs counter to the

"purpose of the [Clean Water Act]." *Id.* at 901. As described below, both the Patapsco WWTP

and Back River WWTP discharge permits were also drafted to be in conformity with the

applicable TMDLs for the receiving waterways.

Given that irreparable harm is "determined by reference to the purposes of the statute

being enforced," it is not surprising that numerous courts have emphasized the importance of

evaluating the impact of violative discharges of pollution on the water quality standards of the

affected receiving water. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803,

824 (9th Cir. 2018). Where "bodies of water are currently violating the state water quality

standards" because of an unlawful discharge of pollution into such waters, courts will find such

harm irreparable. *See W. Va. Highlands Conservancy v. Lexington Coal Co., LLC*, No. 3:19-

0573, 2021 U.S. Dist. LEXIS 237758, at *3 (S.D. W. Va. Dec. 13, 2021); *see also Ohio Valley

Envtl. Coal. v. Fola Coal Co., LLC*, No. 2:13-21588, 2016 U.S. Dist. LEXIS 73904, at *37 (S.D.

W. Va. June 7, 2016). "Because these discharge restrictions are set at the level necessary to

protect the designated uses of the receiving waterways, their violation necessarily means that

these uses may be harmed." *Ohio Valley Envtl. Coal., Inc. v. Apogee Coal Co., LLC*, 744 F.

Supp. 2d 561, 568 (S.D. W. Va. 2010) (*citing Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 157 (4th Cir. 2000)).

**B.      The Back and Patapsco Rivers and Chesapeake Bay Are Substantially Impaired by the Same Pollutants as Those Illegally Discharged by the WWTPs.**

Like the many other "arteries of the Chesapeake Bay," the Back and Patapsco "rivers and estuaries are complex, interconnected ecosystems." *Norfolk S. Ry. v. City of Roanoke*, 916 F.3d 315, 325 (4th Cir. 2019) (Wilkinson, J., Concurring). Although the term "river" is used, these are complex tidal ecosystems with water flowing in both the landward and seaward directions.[2] These two waterways are also, unfortunately, among the most polluted of the Chesapeake Bay tributaries.[3] Accordingly, all three branches of government at multiple levels have long recognized that "[r]estoring damaged waters like the Chesapeake Bay requires sustained effort, entailing cooperation and coordination among the federal government, "[s]tate and local governments, the enterprise of the private sector, and . . . all the people who make this region their home." *Norfolk S. Ry*. 916 F.3d at 323 (*citing* Exec. Order No. 13508, 74 Fed. Reg. 23099, 23100 (May 12, 2009)); *see also Md. Dep't of the Env't v. Cty. Comm'rs*, 465 Md. 169, 182-183 (2019). The Chesapeake Bay and Back and Patapsco rivers have each been put on a TMDL "pollution diet" for numerous pollutants, including nutrients like nitrogen and phosphorus, sediment, and in the case of the two rivers, numerous metals, chemicals, and other pollutant parameters.[4]

---

[2] Declaration of Dr. Lora Harris ("Harris Decl."), Ex. A at ¶ 7.
[3] *Chesapeake Bay Eco Health Report Card*, University of Maryland Center for Environmental Science, Available at: https://ecoreportcard.org/report-cards/chesapeake-bay/bay-health/. (Visited August 19, 2022).
[4] *Maryland Waters with TMDL Documents (A-L)*, Md. Dep't of the Env't, Available at: https://mde.maryland.gov/programs/water/TMDL/Pages/sumittals_m-z.aspx. (Visited August 9, 2022).

As a consequence of these TMDLs, MDE crafted discharge permits for the Back River and Patapsco WWTPs with not only numeric effluent limits that incorporate the TMDL allocations, but also narrative limits and conditions to support achievement of the TMDL and, consequently, restoration of these waters and attainment of their water quality standards.[5] The numeric and narrative limits and conditions are among the most important terms of the discharge permits for each WWTP because failure to meet these terms necessarily results in a violation of the water quality standards established by the state and mandated by federal law. *See* 33 U.S.C. § 1313; *see also* Md. Code Ann., Envir. § 9-314.

The pollution limits in the discharge permits for the Patapsco and Back River WWTPs are of particular ecological importance because of the sheer size of these WWTPs, the scale of potential pollution, and relative contribution to the overall pollution load in the Back and Patapsco rivers, Chesapeake Bay, and even other waters.[6] Moreover, the permits are designed to protect unique, complex, and particularly vulnerable aquatic ecosystems. For example, unlike the Chesapeake Bay and other estuaries, the Patapsco River contains an unusual "three-layered circulation pattern" that has the effect of pushing both waters at the surface and bottom waters toward the Inner Harbor.[7]

The unique hydrodynamics of these tidal waters not only have social, economic, and public health implications, but also create additional challenges for trying to mitigate the

---

[5] Pl. Mem. Ex. B at 10, 50 ECF No. 24.

[6] Declaration of Dr. Ryan Woodland ("Woodland Decl.") Ex. B at ¶ 11. ("Because discharges are distributed by estuarine and tidal currents throughout the Patapsco tributary, including the Inner Harbor, there is also the real risk that the biodiversity we documented at the other sites (Bear Creek, Stony Creek, Middle Branch, Rock Creek, Curtis Creek) could decline and look more similar to the Inner Harbor data should hypoxic conditions increase.").

[7] Harris Decl. Ex. A at ¶ 7.

ecosystem's low-oxygen conditions, also known as hypoxia.[8] Hypoxia is "one of the most pervasive" problems for estuaries, and coastal estuaries are a "particularly vulnerable" type of aquatic ecosystem.[9] Consequently, a waterbody like the Patapsco "is particularly vulnerable to the destabilizing effects of hypoxia" with significant impacts on aquatic species and the food chain.[10] These ecosystem pressures also exert an outsized impact on the human communities living near the Patapsco because of the notable role of sustenance fishing there.[11]

For the broader effort to restore the Chesapeake Bay, these two WWTPs also hold a particular importance. For example, according to the Baltimore County Watershed Implementation Plan, two-thirds of all nitrogen pollution generated from within the county and discharged to the Chesapeake Bay originates from a single source - the Back River WWTP.[12] In Baltimore City, the contribution to overall nitrogen pollution was estimated to be even greater, with about four-fifths of all nitrogen from the City discharged through the Patapsco River to the Chesapeake Bay originating with the Patapsco WWTP.[13]

The proportion of pollution from these two WWTPs to their respective rivers varies depending on the particular pollutant in question and fluctuates considerably over time. For example, MDE's recent efforts to conduct routine sampling for bacteria pollution at or near outfall 001 of the Back River WWTP revealed that on various dates in 2022 the bacteria levels

---

[8] *Id*. at ¶ 11-14.
[9]  Woodland Decl. Ex. B at ¶ 4.
[10] *Id*. at ¶ 10.
[11] *Id.* at ¶ 12.
[12] Phase II Watershed Implementation Plan, Baltimore County, *Available at*: https://mde.maryland.gov/programs/water/TMDL/TMDLImplementation/Pages/WIPPhaseIICountyDocuments.aspx. (Visited August 9, 2022).
[13] Phase II Watershed Implementation Plan, Baltimore City, *Available at*: https://mde.maryland.gov/programs/water/TMDL/TMDLImplementation/Pages/WIPPhaseIICountyDocuments.aspx. (Visited August 9, 2022).

detected near the outfall has at times exceeded levels sampled at upstream and downstream locations, while at other times the sampled levels near the outfall contain lower concentrations of bacteria.[14] These patterns are dictated by the "unusual" hydrodynamics of these water bodies, whereby tidal surface water routinely moves in both directions.[15] Such patterns make these tidal water bodies "unfortunately, vulnerable to transporting contaminants landward and extending residence times."[16]

At the Patapsco WWTP, bacteria levels at the effluent pipe measured by the City and bacteria levels measured in the Patapsco River near the outfall pipe by BWB also show highly variable levels of bacteria that sometimes exceed levels sampled upstream and downstream. Again, this is unsurprising given this hydrodynamic pattern of water flowing both up toward the Inner Harbor and out toward the Chesapeake Bay.[17]

Overall, for many different types of pollutants these two WWTPs are either the dominant source, or a significant contributor of the total pollution in these two rivers.[18] In other words, as goes pollution controls at these WWTPs, so goes restoration of these rivers and the protection of those who fish, swim, or recreate in or on them.[19]

---

[14] *Sampling Results Through July 27*, Maryland Department of the Environment, *Available at*: https://mde.maryland.gov/programs/water/Compliance/Documents/Back%20River%20Sampling%20Results%20through%20July%2027%202022.docx.pdf. (Visited August 9, 2022).
[15] Harris Decl. Ex. A at ¶ 8.
[16] *Id.*
[17] *Id.* ("This is a concern to consider around the illegal Patapsco effluent discharge.") *See also* Declaration of Dr. Jeremy Testa ("Testa Decl.") Ex. C at ¶ 9.
[18] Harris Decl. Ex. A at ¶ 7-8, 22. (The Patapsco is "a tributary where point sources are particularly important.")
[19] Testa Decl. Ex. C at ¶ 4. ("Both systems have achieved dramatic reductions in nitrogen and phosphorus pollution over the past 40 plus years that are largely attributable to improvements in wastewater treatment plant technologies and the will to implement these upgrades at great cost across the watershed.")

C.   **The Pollution from the Back River and Patapsco WWTPs is Directly Causing Irreparable Harm to BWB Members and the Public at Large.**

As detailed in Plaintiff's Memorandum in Support of the Motion for Preliminary Injunction and accompanying declarations, the staff and members of Blue Water Baltimore have numerous professional, aesthetic, recreational, personal, and financial interests in cleaner water in the Back and Patapsco rivers.[20] Generally, the likelihood of irreparable harm to healthy aquatic environments "necessarily means harm" to a plaintiff's members' interests. *See*, *e.g.*, *Sierra Club v. United States Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011). This is particularly relevant in the present case where a disproportionate share of pollution to these ecosystems comes from just a few sources of pollution that are illegally and, in some cases, significantly exceeding permit limits.

1.   **Illegal Pollution at Patapsco WWTP is Causing Irreparable Harm to BWB and its Members.**

In the areas surrounding the Patapsco WWTP, Baltimore Harbor Waterkeeper, Alice Volpitta, is concerned for her own safety, that of her staff at BWB, and members of the organization and local communities, because of the high levels of bacteria present in waters that they routinely sample.[21] In addition, members of the public who consume fish caught areas affected by the Patapsco WWTP face increased risk. Dr. Lora Harris notes that, in the course of conducting her research, she and her colleagues "have spoken with many local fishers and have heard again and again that they intend to consume the fish and shellfish that they catch."[22] Dr. Ryan Woodland also notes the water quality degradation is particularly important in the Patapsco River "given the role this river plays as a source of food security for residents through artisanal

---

[20] Pl. Mem. at 9, 14-15, ECF No. 24.

[21] *See* Declaration of Alice Volpitta ("Volpitta Decl. 6/11/22") Pl. Mem. Ex. G at ¶8-9, ECF No. 24. See also Declaration of Alice Volpitta 12/7/21 at ¶¶ 13, 16, ECF No.10-1.

[22] Harris Decl. Ex. A at ¶ 17.

sustenance harvest."[23] As Dr. Woodland notes, "[f]ishing offers a low-cost, local source of protein for sustenance fishers that is often socially and culturally important."[24] Ms. Volpitta has seen "people fishing from boats in the immediate vicinity of the Patapsco WWTP effluent pipe on many different occasions."[25]

Likewise, BWB member Ms. Rodette Jones lives near the Patapsco River and is concerned for her well-being and that of her Curtis Bay community who "fish and crab in the water near the Patapsco WWTP" due to the extraordinary levels of pollution.[26] Ms. Rodette Jones has expressed concern about the safety of participating in BWB cleanups at Masonville Cove along the Patapsco River which often involve coming into contact with water.[27] Further, for Ms. Jones, who is involved with the ambitious Reimagine Middle Branch Park project for Southwest Baltimore, "[k]nowing that the Patapsco WWTP is polluting the water is frustrating and impacts the type of recreation we are envisioning for that Park."[28]

### 2. Illegal Pollution at Back River WWTP is Causing Irreparable Harm to BWB and its Members.

With regard to the Back River, BWB member Michael Myers has neither fished nor crabbed in the nearby Back River this year due to concerns that the water would make him sick.[29] Mr. Myers reports that few of his neighbors have fished or crabbed this year either and that the usual kayaking, jet skiing, and boating on the river near him this year has dropped dramatically or halted altogether.[30] While Mr. Myers is always cautious about his safety while on

---

[23] Woodland Decl. Ex. B at ¶ 12.
[24] *Id.*
[25] Volpitta Decl. 6/11/22 Pl. Mem. Ex. G at ¶ 14, ECF No. 24
[26] Declaration of Ms. Rodette Jones ("Jones Decl."), ECF No. 10-1 at 12 ¶ 4.
[27] *Id*. at ¶ 6.
[28] *Id*. at ¶ 9-10.
[29] Pl. Reply Mem. Ex. C at 8, ECF No. 28 - 4.
[30] *Id.* at 7-8.

the Back River, because of the extraordinary levels of pollution recently, he will not enter the water at all, even to conduct needed maintenance on his boat and pier.[31]

Mr. Myers says that almost no children are swimming at the nearby beach this year and his community has "significantly changed" its "engagement with the [Back] River" due to the "known pollution coming from Back River WWTP" as well as the "sludge," "clumps of dark matter," and "foam" in the river.[32] Ms. Volpitta has heard from hundreds of BWB members and other residents of Baltimore City and Baltimore County who are outraged or concerned for their safety and she receives reports of individuals, including children, who are sickened by contact with the rivers.[33]

The concerns from and for BWB staff and members involve not just health and safety threats, but also financial and organizational harms as well. Not only does BWB member Douglas Celmer no longer fish or crab in the Back River personally, he has also seen "far fewer customers" for his small business of boat storage and launching this year, which he attributes to the pollution in the Back River.[34] Mr. Celmer's family has lived at his current residence since 1915 and he and his family have made "tremendous economic sacrifice" to "Save the Bay," rendering the City's refusal, by contrast, to "maintain the facility at Back River WWTP," in his view, "unacceptable."[35]

Likewise, BWB member Keith Barr, who is a resident of Baltimore City and owns a boat that is docked near the Back River WWTP, declares that, while the most direct and immediate

---

[31] *Id.* at 8-9.
[32] Pl. Reply Mem. Ex. C at 7-9, ECF No. 28-4.
[33] Declaration of Alice Volpitta ("Volpitta Decl. 7/7/22") Pl. Reply Mem. Ex. C at ¶¶ 5, 8, 9, ECF No. 28-4.
[34] Declaration of Douglas Celmer Pl. Reply Mem. Ex. at 5 ¶ 8, ECF No. 28-4.
[35] *Id.* at ¶ 9.

harm from the illegal pollution at the Back River WWTP is having to tell his child they can no longer swim in the water, he is also finds it "exceedingly difficult to quantify the impact of the pollution" because he "care[s] very deeply about Baltimore" and says it is "hard to overstate the disappointment I feel in my city and the leadership who oversaw this reprehensible neglect."[36] Mr. Barr says that he "can no longer find a way to be optimistic in the near term about investment in the social changes necessary for Baltimore to thrive, when something as fundamental to civilization as managing human waste is willfully ignored at the Back River WWTP and Patapsco WWTP."[37]

The above statements from BWB staff and members are no doubt only a tiny fraction of the shared experience of many thousands of residents who have been impacted by the degraded aquatic ecosystem caused by the ongoing pollution from both the Back River and the Patapsco WWTPs either through sickness, lost business, or foregone recreational opportunities, or even a more fundamental decline in their faith in the institutions designed to protect their waterways and public health. Even if a preliminary injunction is an extraordinary remedy, the prolonged and ongoing deprivation of a "cherished natural resource" renders injunctive relief an appropriate remedy. *Rivera v. United States*, 910 F. Supp. 239, 243 (D.V.I. 1996).

It is also notable that these unfortunate events are taking place during the fiftieth anniversary of the passage of the Clean Water Act, an ambitious statute designed by Congress a half century ago to both "eliminate the discharge of pollutants" and "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251; 92 P.L. 500, 86 Stat. 816.

---

[36] Declaration of Keith Barr Pl. Reply Mem. Ex. C at 1, ECF No. 28-4.
[37] *Id*.

3.    **Illegal Discharges from Both WWTPs are causing Irreparable Harm to the Aquatic Ecosystems.**

After decades of efforts to reduce nutrient pollution to the Back and Patapsco rivers and Chesapeake Bay from these two WWTPs, scientific experts were able to document significant reductions of pollution in the ambient water, as well as a promising ecosystem response in the previous few years.[38] Coincidentally, a team of preeminent estuarine researchers were examining these improvements in water quality in the spring of 2021 when they noticed some unfortunate results from their data collection process.[39] Their research was finding, for example, "extraordinarily high" chlorophyll levels in the Patapsco in 2021 that were nearly twice the average level from 2017 through 2020.[40] These spiking chlorophyll levels indicate a rapid increase in algal growth in the waters that have caused oxygen levels for aquatic species to drop.[41] The researchers understood the "likely" cause of this spiking of pollution and consequent plummeting in water quality was "untreated wastewater."[42] If there were any doubts as to the cause, the researchers were also finding "extremely high concentrations of nitrogen."[43] The researchers examined many different pollutant parameters, including ones they normally never consider, like suspended solids. Solids are not the type of pollution an estuarine researcher would expect to find in these waters because supposed to be removed by the primary stage of wastewater treatment, something that "takes place at even our smallest wastewater treatment plant facilities."[44]

---

[38] Harris Decl. Ex. A at ¶ 4, 9, 22; Testa Decl. Ex C at ¶ 14, Fig. 2.

[39] Harris Decl. Ex. A at ¶ 19.

[40] *Id.* at ¶ 20.

[41] *Id.* at ¶ 9.

[42] *Id.* at ¶ 21.

[43] *Id.* at ¶ 19. ("Because so much of wastewater effluent nitrogen is ammonium this also points to direct impact and change in the Patapsco as a result of illegal discharges.")

[44] *Id.* at ¶ 16. ("I will be honest that I have rarely thought about solids and BOD values for modern wastewater treatment plants because of how effective and expected it is that primary

Critically, this long-term and ongoing pollution event from two massive sources of wastewater pollution has long lasting implications for Baltimore and its waters. In normal conditions, nutrient pollution can be "rapidly removed from the water column."[45] But in vulnerable coastal estuaries, especially ones that experience enough pollution to cause "eutrophication" (inadequate oxygen from overgrowth of plant life) the normal process of nutrient removal changes, with the nutrients being used or recycled to fuel overgrowth of plant life.[46] When this process takes hold, it can have lasting damage, creating a "regime shift" for the ecosystem.[47] In other words, the effects of a continuation of pollution at these levels "are likely to take much longer to reverse" and the public will have to exert even more resources and effort "to shift the estuary out of its new conditions."[48]

Nutrient pollution additions and reductions do not result in "straight line" changes to ecosystem health.[49] Instead, some pollutants leave a "legacy" of persistent and lasting impacts.[50] This is particularly true for phosphorus, one of the two nutrient pollutants discharged at exceptionally high levels at Patapsco WWTP, because phosphorus tends to be "held tightly in the sediments" at the bottom meaning that "[c]ontinuing inputs of phosphorus are likely to take much longer to reverse."[51] In fact, recent research of the Back River indicates that phosphorus can remain in the estuary for a decade.[52] So much phosphorus is contained in the sediments of

---

treatment takes place at even our smallest wastewater treatment plant facilities. However, if illegal discharges from the plants in the Patapsco neglected even primary treatment, then eutrophication will be even greater as additional organic material is added to the system.")

[45] *Id.* at ¶ 21.

[46] *Id.*

[47] *Id.*

[48] *Id.* at ¶ 14, 15.

[49] Harris Decl. Ex. A at ¶ 14.

[50] Testa Decl. Ex. C at ¶ 16.

[51] Harris Decl. Ex. A at ¶ 11, 15.

[52] Testa Decl. Ex. C at ¶ 9.

the Back River that the impact of this legacy pollution on the water can be greater than the amount removed from wastewater effluent in a year.[53] Thus, every day that excessive nutrient pollution, especially phosphorus, is discharged causes longer lasting impacts that will take even more time, money, and effort to reverse.

> **D.    Granting the Relief Requested in this Preliminary Injunction is Necessary to Prevent Further Irreparable Harm to the Patapsco and Back Rivers.**

"There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined." *Nat'l Wildlife Fed'n* 886 F.3d at 819 (*citing Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011)). Representatives of BWB and the City of Baltimore have been engaged in discussions to verify which, if any, of the items in the revised proposed Order filed on July 8, 2022 have been completed.[54] As of August 22, 2022 Plaintiff is not aware of any fully resolved items of requested relief contained in the proposed order. As described below, these items continue to be necessary at both plants to immediately mitigate ongoing and irreparable harm, or to prevent the recurrence of harm, to BWB staff, members, the public, and Baltimore's aquatic environment.[55] Moreover, the requested relief would require the City to provide a report to the Court within 30 days of the order and every 30 days thereafter regarding all progress on the actions outlined in the proposed order; this a critical component to ensure the City is held accountable to meet deadlines and expedite resolution of illegal discharges.

---

[53] *Id*. at ¶ 16.
[54] Proposed Order, ECF No. 28-8.
[55] Pl. Mem. Ex. H at 3, ECF No. 24. *See also* Woodland Decl. Ex. B at ¶ 11;  Harris Decl. Ex. A at ¶¶ 5, 16, 21, and 22; and Testa Decl. Ex. C at ¶¶ 6, 17, 19-21.

1. **Preliminary Injunctive Relief is Appropriate and Necessary at Patapsco WWTP.**

The requested injunctive relief is critical to begin restoring the Patapsco WWTP to proper operating conditions and to bring about a state of compliance "as soon as possible." *Fola Coal Co., LLC*, 2016 U.S. Dist. LEXIS 73904 at 35-36. While the preliminary injunctive relief items alone are not sufficient to fully achieve permit compliance at the Patapsco WWTP, or to ensure proper and enduring operation and maintenance at the plant, they are a critical first step. Importantly, a preliminary injunction does not have to "completely prevent the irreparable harm that it identifies." *Nat'l Wildlife Fed'n* 886 F.3d at 824.

The requested relief includes the most critical actions that can be taken in the immediate term, according to independent wastewater engineers and the inspectors most familiar with these plants. Moreover, as exhaustively detailed by MDE inspection reports, overseeing the Patapsco WWTP is akin to a proverbial game of "Whack-a-Mole," where a problem is discovered, a solution is ordered, and the City either fails to comply with the directive, or addresses the problem only to find that the issue recurs due to inadequate maintenance and the critical failure to maintain any form of "preventative maintenance program."[56] An overarching issue at the Patapsco WWTP is a lack of accountability on the City's part. That is what this preliminary injunction aims to remedy–to hold the City accountable to achieve concrete tasks and to establish deadlines for reporting back to the Court.[57]

---

[56] Pl. Mem. Ex. A at 48, ECF No. 24. ("Preventative maintenance (PM) is a regular topic at the weekly meetings and always met with the same response. The maintenance people are doing reactive maintenance and do not have time to do PM. PM is critical to keep the equipment operating. DPW's responsiveness to the MDE Directive has been limited. The fact that the same ideas and issues keep being rehashed - week after week - in the weekly meetings speaks volumes.")

[57] *Id*. at 5, 14, 33-34.

Certainly, the City's own self-monitoring data indicate little progress, with the latest effluent concentration of nitrogen pollution at ***more than seven times greater than the statutory enhanced nutrient removal level***.[58] As previously discussed in Plaintiff's Memorandum of Support of Motion for Preliminary Injunction, despite commitments by the City to resolve both "immediate" and "short-term" issues no later than March 2022, the latest inspection reports from MDE indicate that everything from primary settling tanks "overwhelmed with floating scum and FOG" to "problems with maintenance and operations" were still occurring.[59]

The City asserted during the hearing before this Court on July 20, 2022 that the Patapsco WWTP would "soon have a similar arrangement [to Back River] in place where pursuant to a consent order and an MDE directive, MES will be on the ground there as well."[60] As of the date of this brief, there is no such arrangement, no MDE directive, no consent order, and MES is not on site at Patapsco. More than 90 days have passed since this possibility first arose but still no agreement is in place to have MES on site.[61] Even if the City soon agrees to allow MES to oversee operations, "[c]ourts must beware of attempts to forestall injunctions through remedial efforts and promises of reform that seem timed to anticipate legal action, especially when there is the likelihood of recurrence." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987).

---

[58] Pollution and violation data for individual facilities or for entire watersheds can be found in the U.S. Env't Protection Agency's Env't Compliance History Online database, Available at: https://echo.epa.gov/. (Visited August 10, 2022). *See* Md. Code Ann., Envir. § 9-1601.

[59] Pl. Mem. Ex. F at 136, ECF No. 24.

[60] Official Transcript of Proceeding on 7/20/22 at 9, ECF No. 42.

[61] *State mulls intervening at Baltimore's second wastewater treatment plant amid growing concerns*, Baltimore Sun. (May 17, 2022). Available at: https://www.baltimoresun.com/news/environment/bs-md-mde-grumbles-patapsco-wwtp-20220517-3fn2xxiivve25hoa55kwxakz3u-story.html (visited August 19, 2022).

Moreover, even if the same MES team that worked to improve operations at Back River was ordered by MDE to begin work at Patapsco today, it took months for MES to complete the initial suite of actions that began bringing pollution levels down at Back River, in part due to the noted lack of cooperation and any sense of urgency by the City.[62] Finally, it must be emphasized that pollution concentrations at the Patapsco WWTP have recently reached levels that were more than twice as high as the highest levels discharged by the Back River WWTP in the last 18 months.[63] Thus, it may take far longer to bring pollution levels down at the Patapsco WWTP.

### a. Requested Relief would Reduce the Irreparable Harm Caused by the City's Effluent Violations at the Patapsco WWTP.

Unfortunately, the pollution concentrations discharged from the Patapsco WWTP remain at staggering levels with total nitrogen concentrations about seven times higher than the levels the WWTP had previously reached in 2019 shortly after the massive, state-subsidized enhanced nutrient removal project was completed.[64] The daily effluent data reported by the City to MDE show that, for the month of July, the average phosphorus concentration of the Patapsco WWTP effluent through July 19 was 0.6 milligrams per liter, twice as high as the statutorily-defined level for enhanced nutrient removal.[65] *See* Md. Code Ann., Envir. § 9-1601.

If this Court were to grant the requested relief, the City would be required to improve and optimize dewatering processes and take all necessary steps to ensure adequate solids removal from the facility. This is consistent with the recommendations of the independent engineering firm engaged by the City, which recommended to "implement improvement/mitigation measures

---

[62] Pl. Mem. Ex. A at 33-34, ECF No. 24.
[63] Pl. Mem. Ex. C at 1, 4, ECF No. 24.
[64] Pl. Mem. Ex. C at 4, ECF No. 24. Note that as recently as December 2020 (during the pandemic) the WWTP was discharging nitrogen pollution concentrations of 3.5 milligrams per liter, near the enhanced nutrient removal standard.
[65] Patapsco WWTP Effluent Data Ex. E at 1-2. (The average was calculated as the mean of the values from July 1 through July 19 in the column labeled "TP".)

and make the drying process operational as soon as possible."[66] Indeed, the City's contracted engineers found that "[r]eturning the sludge inventory to a regular level is paramount for achieving permit compliance. The City should coordinate with the Dryer Facility Operator to increase the amount and reliability of sludge removal to meet plant operational needs."[67]

The requested relief also outlines requirements for increasing personnel capacity at the Patapsco WWTP, which could be accomplished through hiring staff and/or supplementing with contractors as needed. Increasing staff capacity directly impacts the ability of the plant to operate properly and reduce effluent violations.

### b. Requested Relief Would Address Biosolids at Patapsco WWTP.

Granting the requested relief would require the City, within 30 days, to begin to implement a permanent solution for the proper management, treatment, and disposal of solids produced by the treatment process.[68] As the independent engineer emphasized "[r]eturning the solids stream to normal operation and establishing a healthy sludge age in the system is of utmost importance. The effectiveness of treatment process cannot be properly and fully assessed until sludge removal returns to normal conditions."[69]

During the latest MDE inspection of the Patapsco WWTP, completed July 8, 2022, the inspector noted that, in May, the City "was directed to negotiate and implement a permanent solution for the management of biosolids and submit the details of the resolution to the Department on how Patapsco WWTP plans to achieve this goal. A description of the plan of action for addressing the biosolids processing problems was submitted to the Department on June 1, 2022. However, during this inspection, **I found that some of the actions and initiation**

---

[66] Defendant Response in Opposition ("Def. Resp.") Ex. 1 at 2-12, ECF No. 25.
[67] *Id.*
[68] Proposed Order, ECF No. 28-8.
[69] Def. Resp. Ex 1 at 4-1, ECF No. 25.

dates in the submitted plan of action have either changed or the action is not being done."[70] (Emphasis in original).

### c. Preliminary Injunction Would Improve Patapsco WWTP's Fats, Oils, and Grease Issue.

Notably, granting a preliminary injunction would also resolve the problem, as continually noted by MDE inspectors, that the Patapsco WWTP has been plagued by solidified fats, oils, and grease ("FOGs") as far back as 2013.[71] BWB's requested relief includes a requirement that the City submit to the Court, MDE, and BWB a report detailing all specific measures and actions taken to ensure compliance with the FOG Mitigation Plan.[72] MDE inspectors have continued to find "a heavy layer of scum and FOG" after the latest inspection of the Patapsco WWTP.[73] These FOGs not only cause damage to the proper functioning of the WWTP, but fat, oil, and grease balls themselves are being discharged directly into the Patapsco River in violation of the permit.[74]

### d. Preliminary Injunction Would Protect Public Health by Requiring Warning Signs in Areas Affected by Permits Violations of the Patapsco Permit.

The posting of appropriate warning signs at areas known to experience fluctuating high levels of bacteria would directly reduce the threat of irreparable harm to BWB, its members, and the public. Signage and other public notification regarding the discharge of contaminated water would immediately have the effect of protecting the health of BWB staff, members, and the public by ensuring people know to avoid contact with water during and after a pollution event.

---

[70] Patapsco Inspection Report 7/8/22 at 5, ECF No. 36 at 8.
[71] Def. Resp. Ex 1 at Appendix A, 6, ECF. No. 25.
[72] Proposed Order, ECF No. 28-8.
[73] Patapsco 7/8/22 Inspection Report at 16, ECF No. 36 at 19.
[74] Pl. Mem. Ex. B at 009, Patapsco NPDES permit Section II Special Condition A.2.

The Patapsco WWTP permit, like Maryland statute and regulations, requires public notification of any loss of wastewater or discharge from a sanitary sewer system, or wastewater treatment plant bypass, and importantly the permit defines "overflow" to include bypasses.[75] As specified in the permit, these initial notifications required of the City begin the public notification process established by § 9-331.1 of the Environment Article to alert the public of "the direct or potential discharge of raw or diluted sewage."

The recently modernized state law on public notification of overflows and treatment plant bypasses is designed to maximize the ability of the owner or operator to reach the public by requiring electronic notification, posting via social media, and with communications in multiple languages.[76] Importantly, this new law made wastewater treatment plant bypasses a second triggering event, along with the traditional sewer collection system overflows, for the statute's notification requirements. However, this entire system to alert the public of potential health hazards cannot operate effectively, or at all, without the owners and operators of WWTPs taking that first critical step of reporting overflows and bypasses as required by law.

The City's own reporting data certainly emphasize the ongoing need for such notifications. Sampling data at and near the outfall of the Patapsco WWTP show levels of bacteria that routinely exceed safe contact levels.[77] Any suggestion that the WWTPs are not the cause of such levels is refuted by the effluent data at the two WWTPs.[78] Daily effluent concentration data reported by the City show that bacteria levels at Patapsco WWTP have

---

[75] *See*, *e.g.,* Pl. Mem. Ex. B at 034, Patapsco NPDES permit Section III General Condition C.1. See also permit Section I Definitions O, ECF. No. 24.

[76] Code of Md., Env't Article § 9-331.1(b). Section 9-331.1 was amended by Chapter 310 of 2019.

[77] Patapsco WWTP Effluent Data Ex. E

[78] *Id.*

exceeded safe contact levels 20 times just since April 1, 2022, sometimes by more than 20 times the federal safe levels.[79] BWB staff routinely see individuals fishing near this outfall.[80]

Posting warning signs is necessary to protect public health and is required in the permit even if the Patapsco WWTP has not exceeded its permitted limit for bacteria. This is because there are two separate requirements in the Patapsco discharge permit: (1) the limit on bacteria discharged as calculated by monthly geometric mean[81] and (2) a separate requirement for public notification of potential overflows or bypasses.[82] Thus, the Patapsco WWTP could be within its numeric effluent limit for bacteria and still be required to notify the public about WWTP bypasses and collection system overflows.

Separate from and regardless of the monthly geometric mean limit set for bacteria in its permit, state law[83] requires adequate notification of overflows and WWTP bypasses in order to protect the public from exposure to raw or diluted sewage, which contains numerous strains of bacteria and other pollutants that are hazardous to human health.[84] The system of public notification established in the permits and state law is triggered upon a bypass, which has routinely happened and continues at the Patapsco WWTP.

---

[79] *Id*. For more information about bacteria sampling and safe contact levels in Maryland see the MDE webpage on Back River Sampling Results Through July 27, 2022. *Available at*: https://mde.maryland.gov/programs/water/Compliance/Documents/Back%20River%20Sampling%20Results%20through%20July%2027%202022.docx.pdf. (Visited August 21, 2022).
[80] Pl. Mem. Ex. G at ¶ 14, ECF No. 24.
[81] Pl. Mem. Ex. B at 009, Patapsco NPDES permit Section II Special Condition A.2.
[82] Pl. Mem. Ex. B at 034, Patapsco NPDES permit Section III General Condition C.1. Patapsco Permit Section I.O defines "overlow as "any loss of wastewater or discharge from a sanitary sewer system, combined sewer system or wastewater treatment plant bypass (as defined in I.B) which results in the direct or potential discharge of raw, partially treated wastewater into waters of the state."
[83] Code of Md., Env't Article § 9-331.1
[84] Pl. Mem. Ex. G at 5, ECF. No. 24.

For example, the most recent inspection of the Patapsco WWTP described "solids going through the system," with the inspector finding "the release of methane gas in the secondary clarifiers along with floating balls of black solids," "heavy foaming with solids" on the surface in another treatment unit, "solids, algae, FOG, and scum" in the new, state-subsidized denitrification system, and finally "floating scum and FOG" in the final stage of the treatment process just before final discharge.[85] These observed issues were the result of bypasses of numerous systems that were partially or fully inoperable or taken offline altogether, including the enhanced nutrient removal system's "submerged" filters.[86] The permit defines a "bypass" as "the intentional diversion of pollutants from ***any portion*** of a treatment or collection facility." (Emphasis added).[87]

The Code of Maryland Regulations (COMAR) Section 26.08.10.08A(d) also states that unless it is advised by state officials that it is ***not*** necessary, a permittee must notify the public, as soon as practicable but not later than 24 hours after they become aware of an overflow or wastewater treatment plant bypass that could impact "waters used for public recreation where people may boat, fish, or swim." Here, there is ample evidence that areas surrounding Patapsco WWTP and locations tidally impacted by its effluent are often used for boating, fishing, kayaking, and wading into the water.[88] These notifications must be posted each time a bypass occurs, each time raw or diluted sewage is released from the collection system, and each time final-stage effluent monitoring indicates that bacteria levels exceed the assessment threshold values established in COMAR 26.08.02.03-3.

---

[85] Patapsco 7/8/22 Inspection Report at 6, 27, 31, 32, 37, ECF. No. 36
[86] *Id.* at 32.
[87] Pl. Mem. Ex. B at 004, Patapsco NPDES permit Section I.B., ECF. No. 24.
[88] "Volpitta Decl. 6/11/22" Pl. Mem. Ex. G at ¶14, ECF No. 24.

For any event of an overflow (including bypass) with a total volume estimated at 10,000 gallons or more, COMAR 26.08.10.08 (C) requires the owner or operator to notify the public by "[p]osting affected areas, unless advised by the MD Dept of Health, local health department, or environmental health director that the public notification is not necessary." The City asserted during the July 20, 2022 hearing that "[t]his Court not only should not, but cannot get into those issues because it has been dealt with in a separate matter."[89] This is untrue. The federal consent decree to which the City refers focuses on necessary repairs to the collection system to address overflows and did not specify a requirement for posting signs in the areas listed in the requested relief. The fact that the consent decree is silent on posting in those areas is precisely the reason that this issue is not covered in a consent decree and therefore can and should be addressed now.

It is unconscionable that the City would refuse to warn community members about the risk of coming into contact with water known to routinely experience levels of fecal bacteria far above the safe contact standard. This harm is not hypothetical. For example, on July 7, 2022, after a heavy rain event, BWB recorded enterococci bacteria levels at the Maryland Science Center, where children regularly wade into the water, at the Downtown Sailing Center that runs programs for kids to learn to sail, and at the Dragon Boat area at more than 19,000 MPN, which is over 140 times the safe threshold limit of 130 MPN.[90]

Elsewhere throughout the City there are signs permanently posted warning the public that the water is known to experience periodic unsafe levels of bacteria after rain events and to use caution contacting the water within 48 hours after a rain event, or if the water appears cloudy or has a foul order. These signs are often adjacent to structured sewer overflows known to discharge

---

[89] Official Transcript of Proceeding on 7/20/22 at 70,  ECF No. 42.
[90] Blue Water Baltimore data available at: www.baltimorewaterwatch.org. (Visited August 21, 2022).

untreated sewage during heavy storms upstream from the final discharge points in the Inner Harbor. While signs near the structured overflow are important, signs in areas "affected" by the overflows including those articulated in the requested relief are also required under COMAR 26.08.10.08 (B).

>     **2.    Preliminary Injunctive Relief is Appropriate and Necessary at Back River WWTP.**

As with the Patapsco WWTP, the lack of accountability on the part of the City is a primary reason why an injunction is necessary at the Back River WWTP. Plaintiff acknowledges that the numeric concentration of many pollutants recently appear to be consistently within the levels required by the Back River WWTP permit. Nevertheless, without judicial oversight through an injunction, the public can have no confidence that these improvements will be maintained. Further, narrative effluent standards, such as prohibition on discharges of solids are still being violated.[91]

>     **a.    Requested Relief Would Set Deadlines and Ensure Needed Accountability at Back River WWTP.**

Although there has been some improvement at the Back River WWTP, a preliminary injunction is still necessary to address the irreparable harm because it would set deadlines and provide court oversight and the accountability needed to ensure the plant does not backslide. Recent history dictates that reduced pollution levels at Back River WWTP can be fleeting. For example, after reaching a monthly nitrogen concentration of as high as 8.0 milligrams per liter at the Back River WWTP in April 2021, for a period of five months beginning in the summer of 2021, the average monthly nitrogen concentration fell to 4.8 milligrams per liter.[92] But then

---

[91] Back River Inspection Report Ex. D at 17.
[92] Pl. Mem. Ex. C at 1, 3, ECF No. 24.

nitrogen levels quickly spiked to new record high levels in February and March of 2022.[93] This

is unsurprising given the known variability of flow rates that the plant experiences on a seasonal

basis, with flow typically lower during the summer.

Further, any claim that the problems at Back River WWTP are resolved merely because

the numeric effluent limits are being achieved at the present time flies in the face of every

engineering report and recommendation produced in the last year. The MES report includes 238

pages of findings and recommendations. The vast majority of the MES report recommendations

have not yet been implemented and remain as "medium-term" or "long-term" needs.[94] Even the

report produced by the engineering firm selected by the City provides dozens of "short-term" and

"long-term" needs that it says must be made in order to ensure the Back River WWTP can

sustainably operate in full compliance.[95] Because some of the highest priority recommendations

from that report were directly incorporated into the items of requested relief associated with this

preliminary injunction with deadlines attached, granting this injunction will hold the City

accountable to a timeline to expeditiously address the violations.[96] A facility in a "state of

catastrophic repair"[97] can only be explained by "years of neglect that will take time and

dedication to correct."[98] Additionally, the Back River WWTP still faces numerous and severe

operations and maintenance challenges, according to the MES report, the City's third-party

engineering report, and the most recent MDE inspection report. Along with the inadequate

staffing noted by MDE and MES, it is clear that Back River WWTP is likely not resilient enough

---

[93] *Id.*
[94] Pl. Mem. Ex. A. A summary of the "medium-term" and "long-term" issues begins on page 50 of Ex. A, ECF No. 24.
[95] Pl. Reply Mem. Ex. B, ECF No. 28.
[96] Proposed Order, ECF No. 28-8.
[97] Pl. Mem. Ex. H at 1, ECF No. 24.
[98] Pl. Mem. Ex. A at 32, ECF No. 24.

to maintain effluent concentrations within permitted limits permanently, and certainly not when seasonal flows increase.

      **b.   Preliminary Injunctive Relief would set Deadlines and Accountability for Lasting Compliance that has not been Achieved through MES Presence at the Back River WWTP.**

If there were any questions about the need for an injunction to spur prompt compliance at the Back River WWTP, the latest MDE inspection report should answer them. In the inspection that concluded on July 28, 2022, the MDE inspector found the Back River WWTP once again in a state of "noncompliance."[99] Perhaps most concerning, the inspector noted that a safety issue previously identified by MDE had still not been corrected: "Early this year, there were problems identified with the ventilation and air exchange system in the headworks building that is causing high concentrations of hydrogen sulfide (H2S) in the air... **During this inspection, I learned that the problem has not been resolved.**" (Emphasis in original).[100] Inadequate ventilation and the accumulation of hazardous hydrogen sulfide gas is a problem that has impacted both facilities and is among the list of items of requested relief that BWB included in this preliminary injunction.[101]

Although MES oversight has catalyzed and accelerated some progress on a few of the most critical short-term needs at the Back River WWTP, some areas of facility improvements are still many months behind. For example, the latest progress report from MDE on July 22, 2022 indicates that only two of the four centrifuges are online.[102] The City committed in its strategic

---

[99] Back River Inspection Report Ex. D at 1.
[100]  Back River Inspection Report Ex. D at 2.
[101] Proposed Order, ECF No. 28-8.
[102]*July 22, 2022 Progress Report*, Maryland Department of the Environment, Available at: https://mde.maryland.gov/programs/water/Compliance/Documents/BackRiverupdate%207_22_2 2%20.docx.pdf. (Visited August 10, 2022).

plan to having all four in operation about nine months ago, by November 2021.[103] While this is just one example, MES reported that fixing these centrifuges and enhancing the dewatering capacity at the Back River WWTP was the single greatest priority for that facility.[104]

### c. Preliminary Injunctive Relief Would Require Upkeep and Maintenance of Clarifiers at Back River WWTP.

The latest inspection report for the Back River WWTP that concluded July 28, 2022 also noted that, yet again, "[t]here was algae, duckweed and vegetation growing on and around the weirs of the clarifiers. This is causing short circuiting of the weirs. **This problem has been reported during previous inspections.**"[105] (Emphasis in original). The inspector explained that "[a]lgae can cause problems … within the treatment system and can cause problems with pumps by increasing the chances of clogging. The weirs on all secondary clarifiers should be routinely scrubbed to remove the algae. This should be done at least weekly…" If this motion for preliminary injunction were granted, the City would no longer be allowed to repeatedly ignore the findings of the MDE inspector. The proposed injunction seeks to compel the City to remove and prevent the accumulation of any algae and vegetation in any unit process at the WWTP that impacts the ability of the treatment train to control solids releases to the receiving water body.[106]

The inspection also noted that the third primary settling tank that was just brought back into operation within the last two months already has a malfunctioning component causing "floating black solids similar to what I have observed in the [chlorine contact chambers] and secondary clarifiers."[107] This is another issue that BWB is seeking to have addressed by the

---

[103] Pl. Mem. Ex. K at 6, ECF No. 24.
[104] Pl. Mem. Ex. A at 5, ECF No. 24.
[105] Back River Inspection Report Ex. D at 8.
[106] Proposed Order, ECF No. 28-8.
[107] Back River Inspection Report Ex. D at 3. Note that the chlorine contact chambers are the final treatment stage. It is a significant problem to have floating solids reach that stage of the

Court through this preliminary injunction.[108] MDE has informed BWB that it recently conducted

an inspection of the Back River WWTP on August 16, 2022 but the report is not final. BWB will

provide a copy of the inspection report to this court as soon as it is released.

### d. Preliminary Injunctive Relief Would Require the City to Obtain Sufficient Staffing at Back River WWTP.

A preliminary injunction would also require the City to address severe, chronic staffing

shortages at the Back River WWTP. The most recent inspection report states that "**Back River**

**WWTP has a major staffing problem caused by a shortage of trained staff**. When discussing

and obtaining information on routine equipment preventive maintenance (PM) schedules and

tasks, I am told that there are not enough qualified staff to operate the plant and also perform

routine PM." (Emphasis in original).[109] BWB's requested injunctive relief includes immediate

action at both WWTPs to acquire and train adequate staff, which the City identified as a top

concern and "root cause" of the problems at both plants.[110] Further the City committed to address

this issue nearly 12 months ago in its strategic plan as a "Short-term" issue that was to be

addressed nearly six months ago.[111] Adequate staffing could also be addressed through the hiring

of outside contractors if necessary.

Notwithstanding reports of impropriety by personnel at Back River WWTP, BWB

believes that the majority of facility staff are diligent civil servants trying to make the most of a

very difficult job. In fact, both of the third-party engineering reports released in June 2022 found

that the facility employees' jobs were much more difficult than they should be due to the

---

treatment process, and it is a violation of the permit (Special Condition II.A.2) for those solids to
be discharged through the outfall into the river.
[108] Proposed Order, ECF No. 28-8.
[109] Back River Inspection Report Ex. D at 18.
[110] Pl. Mem. Ex. K at 1, 6, ECF No. 24.
[111] *Id.*

additional tasks they need to take on due to malfunctioning equipment, the lack of adequate

operations and maintenance processes in place, and the obstacles, including safety hazards, they

were forced to endure daily as a result of the dilapidated condition of the WWTPs.[112]

The current WWTP employees desperately need help and should have received it many

months ago when the City first acknowledged the scope of the problem. A basic premise of

effective personnel retention is to maintain adequate staffing within an agency so that existing

employees are not overworked to the point of resigning their positions or otherwise abdicating

their assigned duties. By failing to support its remaining workforce with proper staffing levels as

identified in the third party engineering reports, Baltimore City is demonstrating a severe lack of

responsiveness to one of the primary causes of the dysfunctional state of both facilities. In

essence, the Department of Public Works is operating as a "bureaucratic steamroller" that

continues to plod forward without swift action to address the root causes of the problems

afflicting these plants or their innumerable consequences. *Sierra Club v. United States Army

Corps of Eng'rs*, 645 F.3d 978, 987 (8th Cir. 2011) (*citing Sierra Club v. Marsh*, 872 F.2d 497,

504 (1st Cir. 1989)) (Preliminary injunction affirmed as the lack of responsiveness of a

government agency was a "proper factor" to consider in finding irreparable harm).

### e. Bypasses at the Back River WWTP Trigger Notification Requirement in the Relief Requested.

The Back River WWTP permit has identical language to that of the Patapsco permit

requiring notification for overflows and bypasses.[113] The requested relief requiring the City to

notify and coordinate with MDE, Baltimore County, and BWB when there are known overflows

and bypasses is necessary to protect public health and consistent with its NPDES permit.

---

[112] Pl. Mem. Ex. A at 31-35, ECF No. 24.; Def. Resp. Ex. 1 at 2-1 - 2-3, ECF No. 25; Back River
Inspection Report Ex. D at 2.
[113] Back River WWTP Discharge Permit, Pl. Memo  Ex. B at 46 and 74, ECF No. 24-2.

Despite some improvements due to short-term maintenance improvements and MES oversight of the Back River WWTP, there are still both bypasses and periodic discharges of high bacteria levels beyond the safe contact threshold. For example, the latest inspection report at the Back River WWTP noted that "the [denitrification filter] was in various stages of disrepair" and "[s]ome of the filters were submerged under water due to clogging."[114] This resulted in "a layer of floating solids and the remainder contained stagnant water with either floating scum or floating black sludge" that had even attracted "Midge flies."[115] The inspector noted that "algae, duckweed and vegetation" were "causing short circuiting" at one treatment stage, a problem that "**has been reported during previous inspections**."[116] (Emphasis in original).

The inspection report found that "the booms were being breached on the sides and a small portion of the floating solids were floating through" the last stage of treatment before final discharge.[117] As a consequence, the inspector directed that the City "shall keep MDE updated on the expected arrival of the eight booms, and inspect and skim the discharge from all of the contact chambers until the booms are installed."[118]

Based on these latest inspection reports, there is no question that significant operations and maintenance problems continue at Back River, resulting in solids bypassing numerous stages of the treatment system and making their way through the entire WWTP. The WWTP's effluent data also shows daily bacteria levels routinely exceeding the safe contact levels, as confirmed also by MDE in its routine sampling reports posted to the website.[119] These bypasses trigger the

---

[114] Back River Inspection Report Ex. D at 11.
[115] *Id.*
[116] *Id.* at 8.
[117] *Id.* at 17.
[118] *Id.*
[119] Patapsco WWTP Daily Effluent Data, Ex. E; *See also Sampling Results Through July 27*, Maryland Department of the Environment, *Available at*:

required notification provisions of the permit and state law and the frequency and severity of bacteria levels shown by the City's own effluent monitoring data demonstrate why these notifications are desperately needed to protect the public and BWB staff and members.

**E.    Defendant's Delay and Lack of Responsiveness Leaves Plaintiff Without Other Options to Swiftly Redress Ongoing Irreparable Harm.**

While violations have recurred at the two WWTPs for at least five years,[120] the conditions at both WWTPs significantly deteriorated beginning in early 2021.[121] Thus, the present state of noncompliance, particularly at the Patapsco WWTP, has been allowed to continue for an astonishing 18 months.[122] Indeed, about 16 months have elapsed since BWB first noticed the exceptionally high bacteria levels and notified MDE and the public.[123] And it has been more than 14 months since the inspection of the two WWTPs, after which MDE notified the City of numerous violations and widespread conditions of concern at both facilities.[124] Throughout this entire period the amount of excessive and illegal pollution discharged by these two plants has been staggering. For example, the WWTPs' self-monitoring data show that in 2021, the two WWTPs discharged more than 4.3 million pounds of nitrogen.[125] Every single day that either or both of these WWTPs have been allowed by the City to continue discharging pollutants at many times the permit levels or design standards is another day that the WWTPs have been allowed to decimate the aquatic ecosystem, threaten public health, interfere with the

---

https://mde.maryland.gov/programs/water/Compliance/Documents/Back%20River%20Sampling %20Results%20through%20July%2027%202022.docx.pdf. (Visited August 12, 2022).
[120] Pl. Mem. Ex. I at 8, ECF No. 24.
[121] Pl. Mem. Ex. C at 1, 3-4, ECF No. 24.
[122] *Id.*
[123] Pl. Mem. Ex. G at 2, ECF No. 24.
[124] Pl. Mem. Ex. F at 87, 204, ECF No. 24.
[125] Pollution and violation data for individual facilities or for entire watersheds can be found in the U.S. Env't Protection Agency's Env't Compliance History Online database, Available at: https://echo.epa.gov/. (Visited August 10, 2022).

lives and businesses of thousands of residents, and undermine the State's multi-year, multi-billion dollar effort to restore the Chesapeake Bay and our tidal rivers and estuaries.

Perhaps more startling than the magnitude of pollution from the two WWTPs has been the lack of any swift response by the City. At any time during the past 18 months the City should have responded to the actions or events with urgent measures commensurate with the severity of the problem. Instead, both WWTPs are still in noncompliance and Patapsco WWTP is discharging nitrogen at concentrations similar to or greater than during the winter of 2021.[126] The lack of urgency exhibited by the City is well-documented.[127] This sluggish response is in sharp contrast to the mandate of the CWA, which demands "compliance as soon as possible." *Fola Coal*, 2016 U.S. Dist. LEXIS 73904 at *35-36 and is the reason that a preliminary injunction is necessary. "[A] preliminary injunction should issue only when the circumstances truly permit no other course, when the crisis is current or at least appears to be recurrent, that the response of the respondent is recalcitrant and clearly so, and that the total impact of the Order must be assessed." *Odessa Union Warehouse Co-op*, 833 F.2d. at 175; *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (Preliminary injunction granted in part due to "recalcitrant behavior" of defendant).

## III. CONCLUSION

For the foregoing reasons, a preliminary injunction is essential to address the irreparable harm, protect the health and safety of BWB's members, the public at large, the Back River and Patapsco Rivers ecosystems, and the Chesapeake Bay as a whole.

---

[126] Pl. Mem. Ex. C at 1, 3-4, ECF No. 24.
[127] Pl. Mem. Ex. A at 33-34, ECF No. 24. *See also Blistering state report on Baltimore's Back River Wastewater Treatment Plant details 'failures at nearly every level'*, Baltimore Sun. June 9, 2022. *Available at:* https://www.baltimoresun.com/news/environment/bs-md-back-river-mes-report-20220609-kadheruyindq5e2f3o4irsozhu-story.html. (Visited August 11, 2022).

Dated: August 22 2022                    Respectfully submitted,

_____/s/_____
Angela M. Haren (District of Maryland Bar No. 30257)
Chesapeake Legal Alliance
501 Sixth Street
Annapolis, MD 21403
Telephone: (410) 216-9441
Fax: (410) 216-7077
Email: angela@chesapeakelegal.org

_____/s/_____
Martin R. Siegel (District of Maryland Bar No. 22028)
Barley Snyder
1001 East Market Street
York, PA 17401
Telephone: (717) 718-7581
Fax: (717) 843-8492
Email: msiegel@barley.com
Attorneys for Plaintiff Blue Water Baltimore

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of August, 2022, a copy of the foregoing was served on all parties by filing the same electronically with the Clerk of the United States District Court for the District of Maryland.

*/s/ Martin R. Siegel*
Martin R. Siegel (District of Maryland Bar No. 22028)
Barley Snyder
100 East Market Street
York, PA 17401
Telephone: (717) 718-7581
Fax: (717)843-8492
Email: msiegel@barley.com

*Attorneys for Plaintiff Blue Water Baltimore*