# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **BLUE WATER BALTIMORE, INC.,** | * | |
| Plaintiff, | * | |
| | * | Civil Action – Law |
| **v.** | * | No. 1:21-CV-03176 |
| | * | |
| | * | |
| | * | Hon. Lydia K. Griggsby |
| **MAYOR & CITY COUNCIL OF** | * | |
| **BALTIMORE,** | * | |
| Defendants. | * | |
| | * | |

**DEFENDANT'S SUPPLEMENTAL RESPONSIVE BRIEF ON IRREPARABLE HARM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

    A.  BWB Mischaracterizes the City's Response to Problems at its WWTPs ............... 2

    B.  BWB Has Not Demonstrated Irreparable Harm ...................................... 6

    C.  The Improvements that BWB Seeks at the City's WWTPs Have Either Been
        Accomplished or Are Well Underway .................................................. 10

    D.  BWB Is Not Entitled to the Signage and Notice Requirements It Seeks .............. 12

          1.  BWB's "safe contact" levels of bacteria do not apply to the City's
             treatment plant discharges and Maryland law does not support the
             imposition of the notice and signage requirements that BWB seeks ......... 14

          2.  The Public Notice that BWB Seeks is Inconsistent with the Plants' Permits
             and with Maryland Law ......................................................... 15

          3.  BWB's Requested Relief is a Collateral Attack on the City's NPDES
             Permits ............................................................................. 17

          4.  BWB Failed to Provide Statutory Notice of its Claims Regarding the
             City's Alleged Failure to Comply with Public Notice Requirements ......... 18

CONCLUSION ............................................................................................................ 20

CERTIFICATE OF SERVICE ................................................................................... 21

## TABLE OF AUTHORITIES

### Cases

*Assatague Coastkeeper v. Alan & Kristin Hudson Farm,*
    727 F. Supp. 2d 433 (D. Md. 2010) ...................................................................19

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,*
    629 F.3d 387 (4th Cir. 2011) ............................................................................19

*Hallstrom v. Tillamook Cnty.,*
    493 U.S. 20 (1989) .............................................................................................19

*Schneider v. Donaldson Funeral Home, P.A.,*
    No. JFM-16-2843, 2017 U.S. Dist. LEXIS 1949 (D. Md. Jan. 6, 2017) ......... 18-19

*Sierra Club v. Virginia Elec. & Power Co.,*
    145 F. Supp. 3d 601 (E.D. Va. 2015) ..............................................................18

*Sugarloaf Citizens Ass'n v. Montgomery Cnty.,*
    No. 93-2475, 1994 U.S. App. LEXIS 21985 (4th Cir. Aug. 17, 1994) ............17,19

*Palumbo v. Waste Technologies Indus.,*
    989 F.2d 156 (4th Cir. 1993) ...........................................................................17

### Statutes

Md. Code Ann., Envir. § 1-601 .........................................................................18

Md. Code Ann., Envir. § 9-331.1(a) ............................................................... 15-16

33 U.S.C. § 1365(b) ................................................................................... 18-19

### Regulations

COMAR 26.08.10.01B(1)....................................................................................16

COMAR 26.08.10.01B(2)....................................................................................16

40 C.F.R. § 135.3(a)..........................................................................................19

## I.     Introduction

Despite being provided an additional month to produce evidence of irreparable harm, BWB's latest submittal fails to do so. Nothing that BWB now offers the Court justifies the extraordinary remedy of preliminary injunction. BWB offers no new evidence related to harm from bacteria discharged from the plants, relying instead on the same lay witness affidavits that the Court previously found unpersuasive. BWB's inability to proffer any harm, never mind irreparable harm, is not surprising given that the plants have complied with their bacteria limits since at least June 1. BWB also offers three new declarations that speculate on general potential effects of excessive nutrients on the Patapsco and Back Rivers.  However, those declarations contain only generalized conclusions and speculation and no actual evidence that discharges from the plants have caused any of the <u>potential</u> harms (fish kills and/or eutrophication) asserted. This is not surprising given the significant improvements in both plants' effluent.

In the six weeks that have passed since this Court's hearing on Plaintiff's motion, the Back River WWTP has continued to meet all permit limits.[1] There is simply no injunctive relief relevant to Back River that this Court can or should order.

Improvements in the quality of the Patapsco WWTP's effluent have been significant. As anticipated, the solids loading is back to normal and plant performance has improved dramatically. The Plant is on track with its seasonal total phosphorus load limit for September and its total phosphorous monthly average concentration has dropped almost 78%, from 2.56 mg/L in April to 0.57 mg/L in July. **Ex. 1** (Second Declaration of Yosef Kebede) (hereinafter "Second Kebede

---

[1] The Back River permit has weekly, monthly, seasonal and annual limits on total nitrogen ("TN") and total phosphorus ("TP"). The Patapsco permit has seasonal and annual load limits for TN and TP. When this response refers to meeting the load limits for TN and TP, it is referring to load limits calculated on a pro rata basis unless otherwise indicated.

Aff.") at par. 4. And now that the equipment failures have been remedied at the liquid oxygen ("LOX") plant — despite supply chain and contractor issues that caused delays — the City expects the plant to comply with its ammonia and TN limits in September or October and thereafter. *Id.,* at par. 4. The City continues to make significant upgrades to both plants and the Maryland Department of the Environment ("MDE") remains deeply engaged.

For these reasons and the additional arguments provided below, Plaintiff's motion for preliminary injunction should be denied.

## II.    Argument

### A.   BWB Mischaracterizes the City's Response to Problems at its WWTPs.

To bolster its request for a preliminary injunction, BWB makes unwarranted attacks on the City's efforts to correct course at its WWTPs, *see* Plaintiff's Supplemental Brief on Irreparable. Harm [*hereinafter* Pl.'s Supp. Br.] (ECF No. 45) at 32-33, suggesting that intervention by this Court is necessary because the City has demonstrated a lack of urgency or an unwillingness to respond to problems at the plants. Nothing could be further from the truth.

There is ample evidence already in the record showing that the City devoted enormous resources to addressing problems at the plants.[2] In addition, DPW's new Director took numerous additional steps to address these problems and to revamp the agency. Within weeks of being sworn into office, the Director executed the first of several emergency procurement authorizations to address staffing gaps and equipment and part needs, which allowed DPW to contract for goods

---

[2] Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction [*hereinafter* Def.'s Resp.], Ex. 15 (ECF No. 25-16) at par. 3-4 (Decl. of M. Garbark); Def.'s Resp., Ex. 14 (ECF No. 25-15) at par. 2.c. (Decl. of Y. Kebede); Def.'s Resp., Ex. 10 (ECF No. 25-11) (Progress Chart for Back River Recommendations); Def.'s Resp., Ex. 11 (ECF No. 25-12) (Progress Chart for Patapsco Recommendations).

and services on an urgent needs basis without undergoing a lengthy review process and Board of Estimates approval. Second Kebede Aff. at par. 2. In September of 2021, he directed the development of a strategic plan to address violations at the plants. *Id*. He also directed that certain capital improvement projects be expedited to address compliance problems and created a new Environmental Regulatory Compliance Section ("ERCS"), the new chief of which is a former MDE inspector with over 35 years of experience. *Id.* ERCS meets daily and bi-weekly with WWTP employees to discuss compliance-related activities, provides assistance with addressing non-compliance issues, and performs proactive measures to mitigate any non-compliance. *Id*. The Director also commissioned a salary and position study to ensure that employees are compensated appropriately and that position descriptions reflect the plants' needs. *Id*. The safety department was also restructured to institute policies and procedures to proactively monitor, inspect, and address safety compliance within DPW facilities. *Id.* Finally, he prioritized DPW's internal governance related to DPW's non-compliance issues, as well as coordinating with its financial stakeholders to demonstrate DPW's substantial liquidity and sufficient financial capacity. *Id*. As a result of this, S&P Global Ratings removed the recent CreditWatch with negative implications and assigned a stable outlook to the 'AA-' rating on the Baltimore Mayor and City Council, Maryland's existing senior wastewater bonds, and its 'A+' rating on the city's subordinate wastewater obligations. *Id.*

Significantly, BWB's expert asserted in a declaration to this Court dated June 6, 2022, that it would "take at a minimum several years, under the best of circumstances" for the City's plants to come into compliance.[3] However, the ink was barely dry on this declaration before it was proven

---

[3] Plaintiff's Memorandum in Support of Preliminary Injunction [*hereinafter* Pl.'s Mem.], Ex. H (ECF No. 24-8) at par. 5 (Decl. of R. Grachek).

wrong—the Back River plant has been complying with its permit limits since at least June 1, 2022 and the City has made even further progress since that time in maintaining, repairing, and replacing equipment at the plant and performing other recommended actions.[4] Because of that progress, the consent order between the City and MDE is set to terminate in September;[5] however, the City and MDE are now negotiating an extension to the consent order to allow the ongoing support of the Maryland Environmental Service ("MES") at the plant through the end of the year.[6,7]

That treatment plant progress, years ahead of BWB's expert's prediction, was not achieved by a recalcitrant City Administration.  It is the direct result of excellent leadership and an "all hands on deck" diligent effort. That this progress has come despite unprecedented staffing shortages reinforces just how diligently the City's team, its contractors, and MES worked to address problems. Attacks on the City's good faith and best efforts to bring both plants into compliance, years ahead of BWB's expert's prediction, are completely unwarranted and misinformed at best.

In making these uninformed attacks, Plaintiff ignores the fact that correcting these problems has been made considerably more difficult because of the ongoing pandemic (affecting staffing, maintenance, and part and equipment supplies) and the industry-wide worker shortage, neither of which are within the City's control.[8]

---

[4] Second Kebede Aff. at par. 3; **Ex. 2** (Updated Progress Chart for Back River).

[5] Def.'s Resp., Ex. 7 (ECF No. 25-8).

[6] Second Kebede Aff. at par. 3.

[7] Plaintiff makes much of some of the findings in the report from MDE's July 14, 2022 inspection for Back River plant. *see* Pl.'s Supp. Br., Ex. D (ECF No. 45-4). However, the relatively minor maintenance issues referenced in the report are irrelevant because they have had no effect on the plant's compliance with permit effluent limitations.

[8] Def.'s Resp., Ex. 15 (ECF No. 25-16) at par. 3-4 (Decl. of M. Garbark); Def.'s Resp., Ex. 14 (ECF No. 25-15) at par. 2.c. (Decl. of Y. Kebede).

Despite the problems posed by the pandemic, supply chain crisis, and industry wide worker shortages, the progress made at the plants has been steady and overall remarkable. At both plants the main issues stemmed from the buildup of solids. This was addressed with countermeasures to reduce the solids inventory and refocus the solids management plan with the City's vendors. As predicted by the City in June, the plants' solids levels are already back to normal and their performance is excellent except for ammonia and total nitrogen at Patapsco, which will soon be compliant now that the LOX plant is back in operation.

Although the condition of the equipment at the Patapsco plant is "normal for a treatment plant of [its] age,"[9] the City has also made great strides maintaining, repairing, and replacing equipment at that plant and performing other recommended actions.[10] The plant has been meeting its bacteria limit since at least June 1.[11] Furthermore, the high solids inventory at the plant, which led to exceedances of permit limits for BOD, TSS, total phosphorus, ammonia, and nitrogen, has now been reduced to normal levels due to the hauling of solids from the plant by rail and truck.[12] As a result, the plant is now easily meeting its BOD, TSS, and bacteria limits.  Moreover, the total phosphorus load from the plant has fallen almost 80% since May.[13] The plant's ammonia and total nitrogen results did not decline as rapidly as hoped due to delays associated with repairs to the LOX plant, but as of late August, even those problems have been resolved and the City expects the plant to meet its ammonia limits in September or October.[14] These improvements in the Patapsco plant's performance occurred without MES assistance and despite staffing shortages,

---

[9] Def.'s Resp., Ex. 16 (ECF No. 25-17) at par. 5 (Decl. of A. Cassel).
[10] **Ex. 3** (Updated Progress Chart for Patapsco).
[11] Second Kebede Aff. at par. 4.
[12] *Id.*
[13] *Id.*
[14] *Id.*

supply chain issues, continuing Covid infections, and all the other historic economic headwinds the City faces.

**B.  BWB Has Not Demonstrated Irreparable Harm.**

BWB offers no new evidence of harm from bacteria being discharged from the plants, relying instead on the same affidavits from lay witnesses that the Court previously found unpersuasive. Fatally for BWB, both plants are well below the monthly bacteria limits imposed in their permits, Back River since November 2021 and Patapsco since at least June 1, 2022.[15] Thus, neither plant presents a bacterial risk to human health justifying any relief, never mind preliminary injunctive relief.

The declarations of Lora Harris, Ryan Woodland, and Jeremy Testa, attached to BWB's Supplemental Memorandum, are completely silent on the potential effects from bacteria that might be discharged from the plants and none of these declarants hold themselves out as experts on that topic. BWB nonetheless attempts to use Dr. Harris' Declaration regarding the "residence time" of *nutrients* in the Patapsco River to support its arguments regarding bacteria. *See* Pl.'s Supp. Br. (ECF No. 45) at 8, n. 17. Because both plants are in compliance with their bacteria limits, this attempt is irrelevant. Furthermore, as the City demonstrated in its earlier filings, the occasional spikes in bacteria levels in the rivers, about which BWB expresses concern, is not correlated to bacteria discharged from the plants' discharges.[16]

---

[15] *Id.* at par. 3 and 4. At Back River, the *e. coli* limit is 126 MPN/100 ml monthly geometric mean. The monthly results have not exceeded that limit since November 2021 and have not exceeded 7 since May 2022. At Patapsco, the enterococci limit is 35 MPN/ml monthly geometric mean. The results for June and July 2022 were 11.3 and 6.0 respectively. Preliminary August results are also below 7.0. Like other WWTPs in Maryland, the plants do not have daily bacteria limits.
[16] *See* Defendant's Sur-Reply in Opposition to Motion for Preliminary Injunction [*hereinafter* Def.'s Sur-Reply] (ECF No. 34) at 4-8.

The newly offered declarations of Harris, Woodland, and Testa offer only generalized conclusions and speculation about *potential* harms from nutrients. *See* Pl.'s Supp. Br., Ex. A, B, and C (ECF Nos. 45-1, 45-2, and 45-3). The declarations are of no relevance at all to the Back River WWTP, which has met its permit limits for total phosphorus and total nitrogen since at least June and is projected to meet its annual TN load limit as well.[17] Furthermore, there continues to be no evidence in the record that conditions at the Back River WWTP led to either fish kills or eutrophication.

Nor do these declarations attribute any harm to the recent Patapsco nutrient excursions. Dr. Harris notes an increase in the average chlorophyll concentration at the Chesapeake Bay Program's sole monitoring station in the Patapsco River in 2021, *see* Pl.'s Supp. Br., Ex. A (ECF No. 45-1) at par. 20, that she speculates could be attributable to increased levels of TN and TP in plant effluent. However, her speculation is legally inadequate and factually unpersuasive. First, the 2021 data are no longer relevant in light of the improved Patapsco plant performance for nutrients. Second, the data Harris provides shows that the values for TN in the Patapsco River were *higher in 2019* than in 2021 and the values for TP were similar between the two years, even though 2019 was a banner year in terms of Patapsco WWTP performance. Despite the high nutrient levels in the river in 2019,.[18] the chlorophyl levels were dramatically *lower* that year than in 2021, indicating that these data tell us nothing of value other than the instream chlorophyl levels are not influenced by the Patapsco treatment plant discharge. Pl.'s Supp. Br., Ex. A (ECF No. 45-1), at Table 2.

---

[17] Second Kebede Aff. at par. 3.
[18] BWB notes at page 3 of its Memorandum in Support of Motion for Prelim. Inj. that both the Back River and Patapsco plants discharged "low levels of pollution" in 2019 and 2020 following their upgrades to enhanced nutrient removal technology. Pl.'s Mem. (ECF No. 24-1) at 3.

Even if the declarations were able to tie the Patapsco WWTP's significantly improved nutrient discharges (rather than the 2021 discharge levels) to some actual instream harm, the solutions to those excursions are already at hand and, accordingly, there continues to be no need for this Court to issue any extraordinary injunctive relief.[19]

Back River has been in full compliance with its permit limits since at least June 1 and that compliance continues into September (as of the submittal of the City's Response Brief).[20] Accordingly, there is no basis for any injunctive relief, never mind preliminary injunctive relief, from this Court. Back River's performance since at least April 2022 has been excellent. Moreover, Back River is projected to meet its annual TN load limit.[21]

Patapsco has made incredible progress since March and the solids inventory is now back to normal. The plant has easily met its BOD, TSS, and bacteria limits. It has also recently overcome the equipment outage at its LOX plant, which produces oxygen for the treatment process and was essentially out-of-service for a period of months due to a compressor failure, forcing the City to use a less effective source of oxygen. The new replacement compressor arrived in July but was not compatible with the existing piping, requiring the City to quickly find a replacement.[22]

Patapsco has exceeded the seasonal and annual TN and TP limits for 2022. However, the plant's TP levels are now greatly improved.[23] Furthermore, the combined loads from Back River and Patapsco for TP *meet* the Bay TMDL seasonal and annual TP loading limits. When the two plants' TP loadings are viewed together, they are below their combined Chesapeake Bay TMDL-

---

[19] Second Kebede Aff. at par. 4.
[20] *Id*. at par. 3.
[21] *Id.*
[22] *Id.* at par. 4.
[23] *Id.*

related wasteload allocations so there is no impact whatsoever on the Chesapeake Bay from a total

phosphorous perspective. Take July, 2022 as an example:

Back River Allocation:[24]
       5/1-10/31:  seasonal load of 9,211 lbs/month (6,652 for Outfall 01 and 2,559 for 02)
Patapsco Allocation:
       5/1-10/31: seasonal 5,555 lbs. per month

**Total: 9,211 + 5,555 = 14,766 lbs. of TP allocation.**

July performance:[25]
       Back River TP load:       3,860 lbs. (Outfall 01 & 02)
       Patapsco TP Load:       6,722 lbs.
       **Total Combined Load:  10,552**

Thus, the plants' combined TP load discharged in July is 28% *below* their combined Chesapeake

Bay TMDL allocation. Again, this performance is expected to improve each month going forward.

      The LOX plant outage at Patapsco affected NH3 and TN levels.[26] As of late August,

Patapsco ammonia (NH3) was trending back to normal levels as the LOX plant was not back into

service until August 19 and it took a few days for the repaired system to ramp up. The City expects

the plant to return to compliant performance for both NH3 and TN in September or October now

that the LOX plant is back in service.

---

[24] *See* Pl.'s Mem., Ex. B (ECF No. 24-2) at 008-009 (Patapsco Permit Section II.A.1) and 048-049 (Back River Permit Section II.A.1 & 2) (loads calculated by dividing 6-month seasonal load by 6).
[25] Second Kebede Aff. at par. 5.
[26] *Id.* at par. 4.

## C. The Improvements that BWB Seeks at the City's WWTPs Have Either Been Accomplished or Are Well Underway.

BWB asks this Court to require various, vague improvements to the City's WWTPs. These improvements bear little resemblance to the specific recommendations provided by the third-party certified engineers hired by the City, Greeley & Hansen, or by MES.[27] Attached hereto as **Ex. 2** and **Ex. 3**[28] are progress reports prepared by the City that show the status of engineer recommended improvements as of September 1, 2022. These exhibits show that, the City has already completed many of the engineer's recommendations and that the others are either undergoing procurement or in the process of being installed or performed. Significantly, many of the ongoing projects are providing additional redundancy and go beyond what is necessary to meet permit limits.

Of relevance to the Plaintiff's Proposed Order (ECF No. 28-8) [*hereinafter* BWB Prop. Order] are the following improvements to the facilities at the Back River WWTP:

- Two more centrifuges will be available in September 2022, in addition to the two already in service that are sufficient to meet normal operating conditions (**Ex. 2**, Rec. #1) (*Compare id.*, *with* BWB Prop. Order at par. 1.a.i);
- The water supply for the dryer facility is in place (**Ex. 2**, Rec. #3) (*Compare id.*, *with* BWB Prop. Order at par. 1.a.ii). In fact, not only is the plant back to using finished effluent for dryer flushing and fire suppression, but it now has a potable water supply backup;
- Three primary settling tanks (PSTs) are online with a fourth slated for September and a fifth for the end of 2022 (**Ex. 2**, Rec. 4) (*Compare id.*, *with* BWB Prop. Order at 1.a.iv & viii);
- 51 out of 52 denitrification filters are in service/operational and able to run in automatic mode and only 26 are needed for normal flows (**Ex. 2**, Rec. 13, 13a) (*Compare id.*, *with* BWB Prop. Order at 1.a.iv & viii);
- The solids inventory is fully under control (**Ex. 2**, Rec. 18) (*Compare id.*, *with* BWB Prop. Order at 1.a.vii).

---

[27] *See* Pl.'s Mem., Ex. A (ECF No. 24-2) at 048-057 (MES Report); Def.'s Resp., Ex. 1 (ECF No. 25-2) (G&H Report on Back River) and Ex. 2 (ECF No. 25-3) (G&H Report on Patapsco).
[28] Earlier versions of these exhibits were Ex. 10 (ECF No. 25-11) and Ex. 11 (ECF No. 25-12) to Def.'s Resp.

Thus, the City has already accomplished or is well on the way to accomplishing all the facility improvements that BWB seeks, as well as many others. Most of these improvements are not necessary for permit compliance as the plants' July discharge monitoring reports ("DMRs") demonstrate. **Ex. 4** (July DMR for Back River), **Ex. 5** (July DMR for Patapsco). Instead, the City has moved on to restoring redundant equipment and addressing non-permit-compliance-related activities.

For the Back River plant, BWB also seeks to "ensure that floating materials and partially treated solids do not discharge to the waters of the State," BWB Prop. Order at 1.a.v, and ensure that vegetation and algae are removed, *id,* at 1.a.vi. There is no floating material or partially treated solids being discharged (TSS levels are very low) and there is ongoing maintenance to address the vegetation/algae growth issues (which do not affect permit compliance). Second Kebede Aff. at par. 3, 6, 9. The City has also hired 14 new staff for Back River and is providing more training to existing staff. *Compare* BWB Prop. Order at par. 1.c.i, *with* Second Kebede Aff. at par. 7.

The following improvements to the facilities at the Patapsco WWTP are also relevant to BWB's Proposed Order:

- Solids management and inventory is under control with the implementation of sludge removal activities by rail car and hauling by truck and the impending reactivation of the dryers (**Ex. 3**, Rec. 2) (*Compare id.*, *with* BWB Prop. Order at par. 2.a.i & ii);
- PSTs ##1-3 are in service, a purchase order has been approved to replace the skimmers and actuators on the PSTs, and the scum collection system will be automated under SC 983 (**Ex. 3**, Rec. 17) (*Compare id.*, *with* BWB Prop. Order at par. 2.a.v).

Thus, the City has already accomplished or is well on its way to accomplishing the facility improvements that BWB seeks, as well as many others recommended by the City's third-party engineers.

11

BWB also seeks an injunction to "ensure that floating materials and partially treated solids do not discharge to the waters of the State" from the Patapsco WWTP. BWB Prop. Order at par. 2.a.iii. Skimming for floating materials is an ongoing maintenance activity and injunctive relief concerning it is completely unwarranted in light of the plant's excellent TSS results. Second Kebede Aff. at par. 4, 6. BWB also asks that the City be ordered to address the generation of hydrogen sulfide in the headworks (a.k.a. grit) building, BWB Prop. Order at par. 2.a.iii, which is also being addressed by the City's current efforts and is not an issue for compliance with effluent limits.  Second Kebede Aff. at par. 4. The City has hired two more staff people for Patapsco and is providing more training to existing staff. *Compare* BWB Prop. Order at par. 2.d.i, *with* Second Kebede Aff. at par. 7. The Fats, Oils and Grease ("FOG") information that BWB seeks, BWB Prop. Order at par. 2.b.ii, has already been provided to MDE and there is no justification provided for requiring the City to submit a report about the City's FOG efforts in 2021. Second Kebede Aff. at par. 4.

In light of the extensive improvements at the plants and the ongoing commitments for further upgrades, there is no justification for the preliminary injunctive relief that BWB seeks.

### D.  **BWB Is Not Entitled To The Signage and Notice Requirements It Seeks**.

Despite the plants' compliance with their bacteria discharge limits, BWB seeks to have this Court impose extensive notice and signage requirements related to the Patapsco and Back River plants. For both plants, BWB asks the Court to order that the City:[29]

> i.  Report to the Maryland Department of the Environment (MDE), [and for Back River, to the Baltimore County Department of Health], and Blue Water Baltimore within 24 hours each instance in which **bacteria levels as monitored in the final treatment stage surpass state thresholds for safe**

---

[29] *See* BWB Prop. Order at par. 1.b.i and 1.b.ii (emphasis added).

   ***contact*** and subsequently provide a letter of explanation within 5 days of
   reporting the violation; and

  ii. Issue public notifications online and via the existing SSO notification
   system when ***bacteria levels as monitored in the final treatment stage***
   ***surpass state thresholds for safe contact***.

For Patapsco, BWB also asks that the City be required to:[30]

  iii. Immediately post signs in all public access points to the Patapsco River
   impacted by the WWTP outfall indicating that the area is known to
   experience high levels of bacteria that can pose a threat to human health.
   At a minimum, these locations include:

    (1) Downtown Sailing Center
    (2) Canton Waterfront Park
    (3) Middle Branch Rowing Center
    (4) Medstar Harbor Hospital
    (5) Ferry Bar Park
    (6) Dragon Paddle Boats
    (7) Maryland Science Center
    (8) Inner Harbor Amphitheater
    (9) Swan Park
    (10) Canton Kayak Club locations
    (11) Fort Armistead

This action is about BWB enforcing the requirements of the City's NPDES permits for the Back

River and Patapsco treatment plants.  Any requirement that BWB seeks to enforce has to be found

within the four corners of those permits. The notice requirements which BWB would have the

Court enforce are simply not found in the permits.   Furthermore, the relief sought is inconsistent

with the plants' permits and with Maryland law, is an impermissible collateral attack on the

permits, and is otherwise impermissible because Plaintiff failed to provide the notice required

under the Clean Water Act to bring this claim in this pending citizen suit.

---

[30] *See* BWB Prop. Order at par. 2.c.iii.

1. **BWB's "safe contact" levels of bacteria do not apply to the City's treatment plant discharges and Maryland law does not support the imposition of the notice and signage requirements that BWB seeks.**

Throughout its recent briefing, BWB refers to "safe contact levels," "safe contact thresholds," and "safe contact standards" when discussing the levels of bacteria detected in the Patapsco and Back Rivers. *See* Pl.'s Mem. at 4, 17, 25; Plaintiff's Reply Memorandum [*hereinafter* Pl.'s Reply] at 12, 18; Pl.'s Supp. Br. at 21, 22, 24, 31. None of these concepts apply in the instant case. Only the NPDES effluent permit limits impose enforceable requirements on the plants' discharge of bacteria—and both plants have been meeting their monthly permit limits for bacteria since at least June 1, 2022.

In fact, the plants' July bacteria levels were incredibly low compared to the permit limits imposed on them, with Back River discharging 4 MPN/100 ml against a monthly geometric mean limit of 126 (representing 3% of the allowable discharge), and Patapsco discharging 6.0 MPN/100 ml against a monthly geometric mean limit of 35 (representing just 17% of the allowable discharge).[31] Neither the Maryland Beach Action Values nor Maryland's General Water Quality Criteria are applicable to the City's discharge of bacteria from its WWTPs, despite BWB's vague allusions to the contrary.

Here, both WWTPs are subject to monthly bacteria permit limits (*e. coli* for Back River, enterococci for Patapsco).[32] These permit limits are set at levels that MDE determines will meet all of the state's water quality standards and will adequately protect the health of humans and the environment. Because this citizen suit action is solely about enforcement of permit violations at

---

[31] Second Kebede Aff. at par. 3, 4.
[32] Pl.'s Mem., Ex. B (ECF No. 24-2) at 009 (Patapsco Permit Section II.A.2), and 049 (Back River Permit Section II.A.2).

the City's plants, the bacteria limits in the City's NPDES permits for the two plants impose the only applicable bacteria limitations on the plants' discharges.

Because the plants continue to operate in full compliance with their bacteria permit limits, Plaintiffs cannot show that there is any bacteria-related irreparable harm.

### 2. The Public Notice That BWB Seeks is Inconsistent With the Plants' Permits and With Maryland Law.

In addition to asking for the imposition on the City of a nonexistent "safe contact standard," BWB is asking the Court to impose public notice requirements that are unsupported by permit, statute, or regulation.

Starting with the City's discharge permits, each contains standard provisions regarding notice of "bypasses", defined as "the intentional diversion of pollutants from any portion of a treatment or collection facility." Pl.'s Mem., Ex. B (ECF No. 24-2) at 004 (Patapsco Permit Section I.B), and 044 (Back River Permit Section I.B). While the permits state that a "bypass" can be considered an "overflow" if it "results in the direct or potential discharge of raw, partially treated wastewater into the waters of the State," *id.* at 006 (Patapsco Permit Section I.O), and 046 (Back River Permit Section I.O), the permits establish distinct notice procedures for "treatment plant bypasses" and "*sanitary sewer overflows*" or "SSOs". *Id.* at 034-035 (Patapsco Permit Section III.C.1), and 074-075 (Back River Permit Section III.C.1) (emphasis added). Treatment plant bypasses are reported within 24 hours to MDE and followed by a written explanation within 5 days under General Condition III.B.1 while SSOs are reported within 24 hours to both MDE and the local health department. *Id*.

The only statute relied on by BWB for its public notice/signage argument simply does not justify the relief BWB seeks. Section 9-331.1 of the Maryland Environment Article was initially adopted to address sewer system overflows in 2001 and was revised in 2019 to include provisions

related to treatment plant bypasses, among other things. Significantly, the statute deals only with the discharge of "raw or diluted sewage" and in no way adopts the Plaintiff's amorphous "safe contact standard". *See* Md. Code Ann., Envir. § 9-331.1(a). Furthermore, the statute imposes no obligations directly on dischargers beyond the same 24-hour notice/5 day written explanation requirement that is already contained in the City's permits. *Id.* The 2019 revisions to the statute require *the State* to update notice procedures but the updated procedures in no way resemble the Plaintiff's requested relief. Notably, the new procedures, *once the State adopts them through rulemaking*, will require the posting of a notice of a bypass "at the location of the … treatment plant bypass" and on various websites. *Id.* at (b)(2). No part of revised section 9-331.1, even if it were applicable today, requires the City to post permanent signs at any of the 11 locations identified by BWB in its proposed order.

Nor do the existing regulations implementing the pre-2019 version of section 9-331.1 provide any support for Plaintiff's requested relief. These regulations do not use Plaintiff's "safe contact standard" and would only apply to a WWTP bypass if it resulted in the discharge of raw or partially treated sewage.  Code of Maryland Regulations ("COMAR") 26.08.10.01B(1). That is clearly not the case with the City's plants – which are discharging fully treated effluent with truly excellent low bacteria levels.  Furthermore, under the regulations, it is the State and local health departments that determine whether an area should be posted following an overflow, with consideration given to whether "there is an immediate threat of human contact with contaminated water *where the overflow occurred,*" among other factors.  COMAR 26.08.10.01B(2) (emphasis added).

### 3.  BWB's Requested Relief is a Collateral Attack on the City's NPDES Permits.

Because BWB cannot support its requested signage relief by reference to  any effluent limitation or condition in the City's permits, its requested relief is clearly an impermissible collateral attack on the plants' NPDES Permits  Assuming, *arguendo*, that there was a legal requirement for the City to post signs at the 11 locations which BWB asserts, BWB needs first to have such a requirement included in the Patapsco WWTP permit rather than seeking to collaterally attack the lack of such requirements  in those permits through this proceeding.

The Fourth Circuit has consistently rejected attempts by plaintiffs to collaterally attack the content (or lack thereof) of MDE permits during citizen suit litigation such as this case. For example, the Fourth Circuit in *Sugarloaf Citizens Ass'n v. Montgomery Cnty.*, No. 93-2475, 1994 U.S. App. LEXIS 21985 (4th Cir. Aug. 17, 1994) dealt with a challenge to MDE's issuance of a Clean Air Act permit, particularly to the adequacy of the final permit's conditions. However, when closely examining the plaintiff's Complaint, the appellate court found that "Count I is 'simply [an] expression[] of displeasure with the alleged inadequacies of [MDE] review.' … Count I is actually an objection to a state agency's findings under state law, and 'nothing more than a collateral attack on the prior permitting decisions of' MDE." *Id.* at *19-20 (alterations in original) (quoting *Palumbo v. Waste Technologies Indus.*, 989 F.2d 156 (4th Cir. 1993)). The Fourth Circuit found this collateral attack to be an impermissible use of a citizen suit and refused to overturn a permit that had already undergone MDE's full permitting procedures, especially when the responsibility of setting permit limitations was a duty of MDE, not the courts, under Maryland's complex state regulatory scheme. *Id.* at *15-16, 24-26.

Similarly, the Maryland District Court refused to hear claims that were "merely collateral attacks on MDE permitting decisions masquerading as federal statutory claims under the CWA."

17

*Schneider v. Donaldson Funeral Home, P.A.*, No. JFM-16-2843, 2017 U.S. Dist. LEXIS 1940, at *17-18 (D. Md. Jan. 6, 2017). "When a citizen can bring a claim under the CWA alleging a violation of a duly issued discharge permit, a challenge to the underlying validity of an existing permit 'constitutes an impermissible collateral attack.'" *Id.* (quoting *Sierra Club v. Virginia Elec. & Power Co.*, 145 F. Supp. 3d 601, 606 (E.D. Va. 2015)). Furthermore, the court noted that "Maryland provides the plaintiff with an adequate venue in which to air his grievances with MDE's permitting decision and an opportunity for review of his objections," which altogether led the court to refuse to hear the plaintiff's collateral attack on the CWA permit. *Id.* at 19.

The same issues addressed in *Sugarloaf* and *Schneider* apply here. BWB wishes that the City's permits include a requirement to post signs at the 11 areas they have identified. However, there is no such permit requirement. That indisputable fact ends the inquiry. This is a clear collateral attack on MDE's permitting process. *See* Md. Env't Code § 1-601. Therefore, BWB's requested signage relief must be denied. If BWB wants MDE to insert additional signage requirements in the City's permits, it will have to wait until the next permit renewal cycle to raise such arguments.

### 4. BWB Failed to Provide Statutory Notice of its Claims Regarding the City's Alleged Failure to Comply with Public Notice Requirements

Even if the Court were to somehow find that there is a public notice or signage requirement with which the City has failed to comply, and that irreparable harm will occur without such signage, the Court must deny BWB's requested relief because BWB failed to provide the City with notice of this claim prior to bringing its CWA citizen suit. The CWA requires any party bringing a citizen suit to provide notice of the alleged CWA violations to the defendants, to the EPA administrator, and the relevant State before that party may file their citizen suit in court. 33 U.S.C. § 1365(b). EPA's regulations elaborate on this pre-suit requirement, requiring a party to state in

such notice "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated," along with other important details about the alleged CWA violation. 40 C.F.R. § 135.3(a).

This requirement was put in place in order to give alleged CWA violators the opportunity "to attempt to correct the violation and avert the citizen suit." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 400-01 (4th Cir. 2011); *see also Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 439 (D. Md. 2010) ("Thus, '[t]he key to notice is to give the accused company the opportunity to correct the problem." (alteration in original) (citation omitted)). Without this notice, there is no meaningful opportunity for an alleged violator to correct any deficiencies or unpermitted activities, and thus the entire notice requirement is rendered meaningless. The Supreme Court itself has noted just how important the notice requirement is in environmental statutes, stating that "compliance with the 60-day notice provision is a mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 23 n.1, 26 (1989) (discussing the mandatory notice requirements for RCRA and how the requirement is sufficiently similar to that of the Clean Water Act and many other environmental statutes).

Nowhere in BWB's Notice of Intent to Sue letter did it identify any notice or signage requirements with which the City failed to comply, or any other kind of public notice requirement that the City had failed to undertake. As far as the City is aware, BWB raised this issue for the very first time in these preliminary injunction proceedings, without ever giving the City the proper pre-suit notice that the Clean Water Act requires. Therefore, assuming *arguendo* that there are some signage or public notice requirements with which the City is noncompliant, the Court cannot

grant BWB its requested relief or act in any other way upon this claim because BWB did not provide the mandatory pre-suit notice.

## **CONCLUSION**

Given the excellent performance of the Back River WWTP, which is fully compliant with its permit requirements, and the soon-to-be-fully-compliant Patapsco plant performance, coupled with extensive on-the-ground oversight by the State, BWB has failed to demonstrate any irreparable harm to its members attributable to the City's plants' discharges. Thus, the extraordinary remedy of a preliminary injunction is both unwarranted in this case and legally unavailable.

Respectfully submitted,

/s/
F. Paul Calamita (Federal Bar # 25022)
paul@aqual.com
M. Rosewin Sweeney (Federal Bar # 03334)
rosewin@aqualaw.com
AquaLaw PLC
6 South 5th Street
Richmond, Virginia 23219
Phone: (804) 716-9021
Fax: (804) 716-9022


/s/
Dawn S. Lettman (Federal Bar # 08969)
Dawn.Lettman@baltimorecity.gov
Darnell E. Ingram (Federal Bar #21660)
DarnellE.Ingram@baltimorecity.gov
Baltimore City Law Department
100 N. Holliday Street, Suite 101
Baltimore, Maryland 21202
Phone:  410-396-3940
Fax:  410-547-1025

*Attorneys for Defendant,*
*The Mayor and City Council of Baltimore*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of September 2022, I electronically filed the foregoing Response with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record listed below:

Angela Haren
Chesapeake Legal Alliance
501 Sixth Street
Annapolis, MD 21403

Martin R. Siegel
Barley Snyder
100 East Market Street
York, PA 17401

/s/
M. Rosewin Sweeney

21